Jesse **FORRESTAL**, etc., et al.,
Plaintiffs, Appellees,

v.

Henry G. **MAGENDANTZ**,
Defendant, Appellant.

No. 87–1637.

United States Court of Appeals,
First Circuit.

Heard April 8, 1988.

Decided June 3, 1988.

Michael G. Sarli with whom Gidley, Love-green & Sarli, Providence, R.I., was on brief for defendant, appellant.

Howard S. Ross with whom Shuman & Ross, Providence, R.I., was on brief, for plaintiffs, appellees.

Before BOWNES, BREYER and TORRUELLA, Circuit Judges.

BOWNES, Circuit Judge.

This is an appeal by defendant-appellant Dr. Henry G. Magendantz from a jury verdict finding him liable for medical malpractice. Plaintiff-appellee Jesse Forrestal brought suit against defendant for brain damage and an injury to his left clavicle allegedly sustained during his birth.[1] Defendant raises four issues:

(1) whether it was error to admit the testimony of plaintiff's expert witness;

(2) whether plaintiff failed to prove that defendant's conduct was the proximate cause of plaintiff's brain damage;

(3) whether plaintiff's closing argument constituted reversible error; and

(4) whether the district court in its charge misstated the applicable negligence doctrine.

We affirm.

## I. LEGAL AND FACTUAL FRAMEWORK

In order to understand the issues, we first set out the Rhode Island law on the standard of care in medical malpractice cases and then recite the basic facts. The law is found in *Schenck v. Roger Williams General Hospital,* 119 R.I. 510, 935, 382 A.2d 514, 517 (1978):

In medical malpractice cases, this court has repeatedly held that a physician's duty is not to cure, but to exercise the same degree of diligence and skill as physicians in good standing engaged in the same type of practice in similar localities ordinarily have and exercise in like cases. *Marshall v. Tomaselli,* R.I., [118 R.I. 190] 372 A.2d 1280 (1977); *Wilkinson v. Vesey,* [110 R.I. 606, 295 A.2d 676] *supra; Bigney v. Fisher,* 26 R.I. 402, 59 A. 72 (1904). This standard of care governs a physician's conduct at all times while a patient is under his care and includes the diagnosis as well as the treatment of the patient's ailment. With regard to the diagnosis of patient maladies, we expounded upon the standard of care required of a physician by stating in *Wilkinson* that he must "avail himself of all the scientific means and facilities available to him so that he can obtain the

---

1. The complaint also included Jesse's mother, Joyce, as a plaintiff and named the Rhode Island Group Health Association, Inc., as another defendant. Plaintiffs voluntarily dismissed the action against the Association prior to trial and the mother dismissed her claims against Dr. Magendantz at the close of the plaintiffs' case.

best factual data upon which he can make a diagnosis * * *." *Wilkinson v. Vesey, supra,* 110 R.I. at 615–16, 295 A.2d at 683.

Since the jury found defendant liable, our exposition of the facts is made in the light most favorable to plaintiff, drawing all reasonable inferences in his favor and without evaluating the credibility of witnesses or the weight of the evidence. *CVD, Inc. v. Raytheon Co.,* 769 F.2d 842, 848–49 (1st Cir.1985), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312 (1986); *Computer Systems Engineering, Inc. v. Qantel Corp.,* 740 F.2d 59, 65 (1st Cir. 1984).

Defendant was the obstetrician who treated Jesse's mother during her pregnancy and delivered Jesse on May 4, 1980. Twenty-six days after Jesse's birth, Dr. Richard Rosen, Jesse's pediatrician, found a fracture of Jesse's left clavicle. Dr. Rosen attributed the fracture to trauma suffered by Jesse at the time of his birth.

When Jesse was about eighteen months old, he began to exhibit seizure phenomena; his head turned to the right or left and his right or left upper extremity exhibited tremors and quivering. The seizures lasted five seconds. The frequence of the seizures increased over time. Dr. Rosen referred Jesse to Dr. Taranath Shetty, a specialist in pediatric neurology and electroencephalograms. Dr. Shetty examined Jesse and concluded that brain damage was the cause of the seizures.

The hospital at which Jesse was born was rated as Class 3, meaning that it was a state of the art facility with the most modern obstetrical equipment available. It was used for high risk obstetrical patients.

Although the hospital provided the equipment necessary for determining, prior to delivery, the relation of the width of the mother's pelvic opening to the size of the baby's head, and although defendant knew how to use the equipment, he did not do so. Defendant did not use the available ultrasound equipment to measure the biparietal diameter of Jesse's head in utero; he did not use the available X-ray pelvimetry to determine whether Jesse's head would fit through his mother's pelvic opening; nor did he use any instruments to measure the width of the pelvic opening of Jesse's mother, relying instead on measurements made by using his hand and fingers. Defendant acknowledged that it is important to make a determination prior to delivery of whether the baby will fit through the mother's pelvic opening.

During labor, defendant did not use electronic fetal monitoring, which was available. In delivering Jesse, defendant used a forceps on the baby's head. He used the forceps first to turn Jesse's head, removed them, and then used them again to pull Jesse through the birth canal. Defendant performed an episiotomy on Jesse's mother to help the head out of the birth canal; that is, he cut a slit in the mother's vulvar orifice. Defendant decided to use forceps after Jesse's mother had two contractions. It was defendant's opinion that Jesse could have been delivered without the use of forceps if his mother had labored for another hour or two.

## II. THE ADMISSION OF EXPERT TESTIMONY

The testimony of Dr. John F. Hillabrand, plaintiff's expert, was presented by a videotape deposition. The exclusion or admission of testimony is governed by the Federal Rules of Evidence in diversity cases, as well as in all others. *Ricciardi v. Children's Hospital Medical Center,* 811 F.2d 18, 21 (1st Cir.1987). We, therefore, turn to Federal Rule of Evidence 702 which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The admission of expert testimony under Federal Rule of Evidence 702 is within the discretion of the district court and will be reversed only for an abuse of discretion. *Escolastica DaSilva v. American Brands,*

*Inc.*, 845 F.2d 356, 361 (1st Cir.1988); *Marshall v. Perez Arguaga*, 828 F.2d 845, 851 (1st Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1027, 98 L.Ed.2d 991 (1988); *Allied International, Inc. v. International Longshoremen's Association*, 814 F.2d 32, 40 (1st Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 79, 98 L.Ed.2d 41 (1987). There can be no question of Dr. Hillabrand's qualifications. He is a board certified obstetrician and delivered babies from 1938 to January 1, 1986, when he retired. The only abuse of discretion here would have been the blanket exclusion of Dr. Hillabrand's testimony.

Nor was there any reason for excluding the testimony on the basis of Rule 703, which states:

> The fact or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or *made known to the expert at or before the hearing.* If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the fact or data need not be admissible in evidence. [Emphasis added.]

Dr. Hillabrand based his opinions on his review of all the hospital and medical records pertaining to the mother and the baby, the reports of all the doctors who had been consulted by the attending physicians, and the depositions of the doctors that had been taken prior to his own deposition. This is one of the standard methods of laying the foundation for an expert's opinion in medical malpractice cases. The other methods are the use of a lengthy hypothetical question or having the expert attend the trial and hear the testimony establishing the facts. The method used here is best suited to deposition testimony that is to be used at the trial.

Defendant advances two arguments for the exclusion of Dr. Hillabrand's testimony: that it relied on the opinion of another; and that his opinion that hypoxia causing brain damage was precipitated during the birthing process was "based upon a pyramiding of erroneous inferences." We discuss Dr. Hillabrand's testimony in detail in the next section of the opinion. It suffices to say now that the defendant's first argument is factually inaccurate, and the second is directed to credibility, not admissibility.

## III. THE PROXIMATE CAUSE ISSUE

Defendant argues that he was entitled to either a directed verdict or a new trial because "plaintiff failed to prove to a reasonable degree of medical probability that his seizure disorder was proximately caused by an hypoxic event occurring at birth."

Hypoxia is defined as "low oxygen content or tension; deficiency of oxygen in the inspired air." *Dorland's Medical Dictionary* 755 (25th ed. 1974). Defendant does not deny that hypoxia in the brain can cause damage resulting in the symptoms exhibited by Jesse. His argument is that plaintiff did not prove that hypoxia caused Jesse's seizures, and that defendant's negligence was the cause of the hypoxia.

We agree with defendant that the Rhode Island law on proximate cause in the context of a medical malpractice case is controlling. The latest case on the subject is *Gray v. Stillman White Co., Inc.*, 522 A.2d 737 (R.I.1987), in which the Rhode Island Supreme Court held:

> It is well settled in this state that when expert medical testimony is offered to establish a causal relationship between a defendant's act or omission and the plaintiff's injury, "such testimony must speak in terms of 'probabilities' rather than 'possibilities.'" Doctor Fischbein's report states that "[i]n the absence of any other identified cause for Justin's high blood lead levels during 1976–1977, it is likely and consistent with reports in the medical literature that the parental occupation in this case was significant." The words "likely" and "consistent with" do not connote "probability." *Evans v. Liguori*, 118 R.I. 389, 397–98, 374 A.2d 774, 778 (1977) (testimony that decedent's symptoms are "consistent with" suicidal intent "merely begs" question of causal relationship). Hence, Dr. Fischbein does not speak in terms of probabilities, and his observations fail to provide the essen-

tial evidentiary basis on which proximate causation can be properly assessed. *Id.* at 741–42.

Defendant focuses on the report of Dr. Shetty who, at the request of Jesse's pediatrician, made a neurological examination of the boy's brain. The pertinent portion of Dr. Shetty's report states: "IMPRESSION: Focal seizure disorder refractory to Dilantin therapy. History and the right upgoing toe noticed on exam suggests that cerebral hypoxia in the perinatal period *is the most likely cause* here." (Emphasis added.) Perinatal is defined as "pertaining to or occurring in the period shortly before or after birth." *Dorland's Medical Dictionary* 1163–64 (25th ed. 1974).

■ The report was admitted in evidence and the district court ruled that the phrase "most likely cause" met the Rhode Island standard of causation in a medical malpractice case. Although the report was properly admitted in evidence under the Federal Rules, we think the court erred in its ruling on the standard of proof. It was bound to apply the substantive law of Rhode Island. Under the doctrine of *Erie R. Co. v. Thompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), "federal courts and Congress are constitutionally precluded from displacing state substantive law with federal substantive rules in diversity actions." *McInnis v. A.M.F., Inc.*, 765 F.2d 240, 244 (1st Cir.1985). *See also Ricciardi v. Children's Hospital Medical Center*, 811 F.2d at 21. In light of the statement by the Rhode Island Supreme Court that the word "likely" does not connote "probability," the district court erred in equating "most likely" with "probability." This means that Dr. Shetty's statement could not be used as a basis for finding that cerebral hypoxia during the perinatal period was the proximate cause of plaintiff's brain damage.

■ The question, therefore, is whether there was other competent evidence in the record from which it could be found that defendant was negligent and thus caused plaintiff's brain damage. Our review of the record, as already noted, is weighted heavily in favor of plaintiff. In order to set aside a verdict, it must be against the clear weight of the evidence or based upon evidence which is false or will result in a clear miscarriage of justice. And the district court's decision that there was sufficient evidence for the verdict will be overturned only if there was an abuse of discretion. The question presented in a motion for judgment n.o.v. is even more circumscribed: whether after reviewing the record in the light most favorable to plaintiff and drawing all reasonable inferences in his favor, the evidence is sufficient to support the verdict. *CVD, Inc. v. Raytheon*, 769 F.2d at 848–49. *See also Conway v. Electro Switch Corp.*, 825 F.2d 593, 598–99 (1st Cir.1987).

We start our review of the record with the testimony of defendant himself. He acknowledged that it would be "injudicious" to use forceps to deliver a baby through a pelvic opening which was too small to admit passage of the baby's head. Defendant agreed that the "injudicious" use of forceps could cause the injuries that Jesse suffered: a fracture of the left clavicle and a brain injury resulting in seizures. Defendant also testified that forceps would not have been necessary if the mother had been allowed to continue labor for another hour or two. Based on this testimony alone, it could be inferred that defendant's use of forceps was "injudicious," resulting in the injuries to the clavicle and the brain damage suffered by Jesse.

We next turn to the testimony of plaintiff's expert, Dr. Hillabrand. His opinion testimony was based upon reasonable medical certainty, and defendant did not contend that this failed to meet Rhode Island's "probability" rule. As already noted, Dr. Hillabrand examined the baby's mother prior to his testimony. He measured her pelvis and determined that the opening between the pelvic bones was 8.5 centimeters. It was Dr. Hillabrand's opinion that the pelvic opening "was inadequate for a normal sized baby to pass through." Dr. Hillabrand testified that the size of the pelvic opening was the same at the time of the birth of Jesse as when he made the measurements. He stated that the two most common problems associated with the birth

of a baby that is too large for the pelvic opening are "brain damage and shoulder distorchia." [2] It was Dr. Hillabrand's opinion that defendant's use of forceps, combining rotation and extraction through the pelvis, "resulted in damage both to the baby's head and the baby's shoulder girdle."

It was Dr. Hillabrand's opinion that the use of forceps could have been avoided if the defendant had followed standard medical practice and determined the size of the mother's pelvic opening and the size of the baby's head prior to delivery. This could have been done by using the available ultrasound equipment, making instrument measurements of the pelvis, and using the available X-ray pelvimetry equipment. According to Dr. Hillabrand, if a proper predelivery investigation had been made, using the available medical equipment, it would have disclosed that the baby's head was too large to readily pass through the birth canal. The baby, therefore, should have been delivered by a Caesarian Section. If this had been done, Jesse would not have sustained the injuries to his shoulder and brain.

Dr. Hillabrand also testified that the mother's medical records showed that someone had measured her pelvic opening and noted that it measured 8.5 centimeters. According to Dr. Hillabrand, this indicated that the opening was of marginal size, at best, and should have alerted defendant that the size of the pelvic opening vis-a-vis the size of the baby's head had to be determined prior to birth.

Dr. Hillabrand stated: "It is quite certain that the trauma associated with a difficult labor and delivery were the things that were accountable for the damage to the baby's head and damage to the baby's shoulder girdle." In Dr. Hillabrand's opinion, the damage could and should have been avoided.

It is true that in the course of his testimony Dr. Hillabrand did state, in answering a question as to whether hypoxia was present during the birthing process, that the written report of Dr. Shetty so indicated. If this were the sole basis of Dr. Hillabrand's opinion, it would be inadmissible. But Dr. Hillabrand made it clear on both direct and cross-examination that his opinions on all aspects of defendant's conduct were based on his own knowledge and experience.

▆ It was Dr. Hillabrand's opinion that the baby suffered some sort of hypoxia episode during birth which was the direct result of the delivery and the trauma associated with it. This opinion was based on Dr. Hillabrand's own knowledge and experience and did not depend on Dr. Shetty's report. It was also Dr. Hillabrand's opinion that Jesse suffered brain damage as a result of the use of the forceps by defendant. Based on this, the jury could have found that defendant's negligence caused Jesse's brain damage regardless of the grounds for Dr. Hillabrand's opinion about the onset of hypoxia. Dr. Hillabrand made it clear more than once during his testimony that defendant did not exercise the same degree of medical skill as physicians in good standing in the locality would have exercised. Based on our reading of the record and the applicable standard of review, we find no grounds for a directed verdict, judgment n.o.v., or a new trial.

## IV. THE CLOSING ARGUMENT

During final argument, plaintiff's counsel stated: "I want you to picture yourself as if Jesse was your little boy." There was an objection and the court told the jury:

This is a question of argument, members of the jury, and you view it as such. You will be told you must decide this case impartially, without prejudice and without sympathy and without—based purely on the facts and the law as I give it to you. Proceed, Mr. Ross.

Counsel then asked the jury to put themselves "in the shoes of Jesse" or "in the shoes of his mother and father." Defense counsel objected and the court stated, "I don't know how else I can do it, Mr. Sarli, I have told the jury this is argument." The

---

2. We have been unable to find the word "distorchia" in either *Dorland's Medical Dictionary* or *Webster's Third.* We assume that the word intended was "distortion."

argument continued, "and then say, members of the jury, if this were my child, what amount of money would I accept for my child to have Jesse's injuries and afflictions." Upon objection, the court stated: "Mr. Ross, don't press your luck. Carry on to something else. If it's not a question of monetary return to Mr. or Mrs. Joyce, then it's not what we're talking about here. Proceed." Continuing his argument, plaintiff's counsel suggested to the jury, "put yourself in Jesse's shoes." Defense counsel's objection was overruled, the court stating, "We're talking of Jesse now, we're not talking of Mr. and Mrs. Forrestal."

There can be little doubt that suggesting to the jury that it put itself in the shoes of a plaintiff to determine damages is improper argument. This so-called Golden Rule argument has been universally condemned "because it encourages the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence." *Ivy v. Security Barge Lines, Inc.*, 585 F.2d 732, 741 (5th Cir.1978) (collecting cases), *cert. denied*, 446 U.S. 956, 100 S.Ct. 2927, 64 L.Ed.2d 815 (1980).

The question is whether the remarks constituted reversible error. There are a number of factors to be considered in making this determination. First and foremost is the deference due the district court's judgment. *Mitchell v. Weaver*, 806 F.2d 300, 302 (1st Cir.1986); *Joan v. City of Chicago*, 771 F.2d 1020, 1022 (7th Cir.1985); *Arnold v. Eastern Air Lines, Inc.*, 681 F.2d 186, 197 (4th Cir.1982), *cert. denied*, 460 U.S. 1102, 103 S.Ct. 1801, 76 L.Ed.2d 366 (1983). We agree with the Sixth Circuit that in assessing the effect of improper conduct by counsel,

> a court must examine, on a case-by-case basis, the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case (e.g. whether it is a close case), and the verdict itself.

*City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 756 (6th Cir.1980).

■ We note first that, in addition to the instructions given during closing argument, the court instructed the jury at the start of the trial that it had

> to be absolutely objective as you listen to this evidence, to be fair, to be impartial, and not to be swayed by pity or sympathy, but to look to the facts in the case and the evidence as it develops, and the instructions on the law that I will give to you, and apply that law to the facts.

In its final instructions, the court twice told the jury that the only evidence to consider was the testimony and the exhibits. In discussing damages, the court stated:

> Now, damages must be proved, that is to say, the plaintiff must prove his damages by a fair preponderance of the evidence, just as he must prove liability by a fair preponderance of the evidence. Therefore, the amount that you may award as damages is subject to limitation in that you may make such award only to the amount upon your consideration of the evidence before you, and it is required insofar as humanly possible that you determine the precise amount which in your considered judgment constitutes a fair and adequate compensation for such damages as you find have been proved.

> The rule of damages in actions of this type is compensatory, not punitive. The key determination is compensation for injuries and losses proven by a fair preponderance of the evidence to have occurred.

> Again, I instruct you that the only evidence that you have is the evidence that you have listened to from the witnesses and the exhibits that have come in. The only way you determine damages, if you come to the question of damages in this case, is based upon the evidence that you have before you.

The court also stated near the conclusion of its charge:

> It goes without saying, of course, that prejudice, sympathy or compassion should not be permitted to influence you

in the course of your deliberations. All that either party here is entitled to, or for that matter expects, is a verdict based upon your fair, scrupulous, and conscientious examination of the evidence and an application thereto of the law as it has been given to you by the Court. To yield either to sympathetic impulses or to considerations flowing from prejudice or bias would be to strike a blow at the very cornerstone of the system which you and I are sworn to uphold.

We think the district court effectively nullified the effect of the Golden Rule argument.

In considering the totality of the circumstances, we note first that the damages to be determined consisted solely of an amount to compensate Jesse for present and future pain and suffering. There were no bills for medical expenses, loss of wages or other items of specified amount. By its very nature, pain and suffering is hard not to personalize. Although we abjure jurors to be objective, the measurement of how much pain and suffering is worth in dollars is bound to start with a subjective reaction on the part of the jurors. We also note that, since the jury here obviously believed Dr. Hillabrand, this was not a close case. His testimony practically compelled a verdict in favor of plaintiff. Finally, and very significantly, defendant has not suggested that the amount of damages awarded ($100,000) was excessive.

## V. THE JURY INSTRUCTIONS

■ Defendant asserts that the district court misstated the Rhode Island law as it applies to a physician's duty to use available scientific means in making a diagnosis and that such misstatement was prejudicial and requires a new trial. We find that there was no misstatement of the applicable Rhode Island law.

The instruction attacked stated:

Now, further, members of the jury, in considering this question [medical negligence], I instruct you:

"If a physician, as an aid to treatment or diagnosis, does not avail himself of all of the scientific means and facilities available to him so that he can obtain the best factual data upon which he can make a diagnosis and treatment of the patient, such an omission can be considered as evidence of negligence."

When we say he must avail himself of all scientific means and facilities, it merely means that the physician's conduct must be measured by the degree of diligence and skill possessed by other physicians in similar localities; that is, the physician should employ the scientific advancements available to him.

Defendant claims that, although this is a correct quote from *Wilkinson v. Vesey*, 110 R.I. 606, 295 A.2d 676, 683 (1972), it did not take into consideration the modification of that language in *Schenck v. Roger Williams General Hospital*, 382 A.2d 514. Defendant objects to the use of the phrase "all of the scientific means and facilities available to him" and argues that under *Schenck*, this has to be modified to state "and there is competent evidence which indicates other skilled physicians would employ such resources." Defendant's selective parsing of *Schenck* obfuscates its clear meaning.

At no point in the opinion does *Schenck* suggest that the language of *Wilkinson* be modified. *Schenck* first stated the standard of care in medical malpractice cases, *supra*, at 304–05. Although the court acknowledged that the *Wilkinson* rule had been criticized,[3] it rebutted the criticism and reaffirmed the *Wilkinson* standard:

The rule calling for use of all available scientific aids does not impose a greater burden upon a physician at the diagnostic stage of medical care than during actual treatment. In both instances, the conduct of a physician is measured by that degree of diligence and skill possessed by other physicians in similar lo-

---

**3.** In *Wilkinson,* the court stated that a physician must "avail himself of all the scientific means and facilities available to him so that he can obtain the best factual data upon which he can make a diagnosis...." *Wilkinson v. Vesey,* 295 A.2d at 683.

calities. While this court in *Wilkinson* never contemplated that a physician, in making a diagnosis, would be required to rule out any and " 'all possible maladies to which the human race falls victim,' " it did recognize that in order to assess intelligently his patient's condition, a physician should employ the scientific advancements available to him. When a physician fails to conduct a test, consult a report, or perform an examination, i.e., utilize the scientific means of diagnosis at his disposal, and there is competent evidence which indicates other skilled physicians in similar localities would employ such resources, the diagnostician is not employing the tools of his profession in the skillful manner required of him by law. It is this kind of conduct, and no other, which the court in *Wilkinson* held to be evidence of negligence.

*Schenck v. Hospital,* 382 A.2d at 517–18.

Here, the court, just prior to giving the attached instruction, told the jury:

[The standard of care of a physician] has been defined as the employment of the same degree of diligence and skill which is commonly possessed by other members of the profession who are engaged in the same type of practice in similar localities, having due regard for the state of scientific knowledge at the time of treatment.

Both instructions, read conjunctively, accurately track the language of *Schenck.* The district court's instruction on Rhode Island malpractice law was correct.

In conclusion, we point out that defendant admitted that the three scientific diagnostic tools he failed to use, X-ray pelvimetry, ultrasound, and electronic fetal monitoring were available to him at the hospital where Jesse was born and that he knew how to use them. The fact that this equipment was available at the hospital used by defendant, along with Dr. Hillabrand's testimony, was "competent evidence which indicates other skilled physicians in similar localities would employ such resources."

*Affirmed.*