July 1, 1993
 UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT
 

No. 92-2069

 UNITED STATES,

 Plaintiff-Appellant,

 v.

 PAUL J. KIRVAN,

 Defendant-Appellee.

 

No. 92-2289

 UNITED STATES,

 Appellee,

 v.

 PAUL J. KIRVAN,

 Defendant-Appellant.

 

 ERRATA SHEET

The opinion of this court issued on June 29, 1993 is amended as
follows:

On page 3, line 7, "erred in a granting" should read "erred in
granting".

On page 3, line 20, "the money in into a bag" should read "the
money into a bag".

 UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT
 

No. 92-2069

 UNITED STATES,

 Plaintiff-Appellant,

 v.

 PAUL J. KIRVAN,

 Defendant-Appellee.

 

No. 92-2289

 UNITED STATES,

 Appellee,

 v.

 PAUL J. KIRVAN,

 Defendant-Appellant.

 

 APPEALS FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Edward F. Harrington, U.S. District Judge]
 

 

 Before

 Cyr and Boudin, Circuit Judges,
 
 and Burns,* Senior District Judge.
 

 

Richard Abbott for Paul J. Kirvan.
 
Timothy Q. Feeley, Assistant United States Attorney, with whom A.
 
John Pappalardo, United States Attorney, was on brief for the United
 
States.

 

 June 29, 1993
 

 

* Of the District of Oregon, sitting by designation.

 BOUDIN, Circuit Judge. Paul Kirvan appeals from a jury
 

verdict finding him guilty on one count of armed bank

robbery, in violation of 18 U.S.C. 2113(d). The jury also

convicted Kirvan of carrying a firearm during the commission

of a crime of violence, in violation of 18 U.S.C. 924(c),

but the district court set that conviction aside. On cross-

appeal, the government argues that the trial judge erred in

granting a judgment of acquittal on this second count. We

affirm the bank robbery conviction, reinstate the firearm

conviction and remand for resentencing. 

 The facts, limited to those pertinent to the issues on

appeal, can be briefly stated. A lone masked robber held up

a savings bank in Lowell, Massachusetts, at 3:25 p.m. on

August 20, 1991. The surveillance photographs taken by a

bank camera showed the robber wearing a distinctive rain hat

and holding what appeared to be a large handgun. Several

persons in the bank saw the same robber and the gun. At one

point the gun fell to the floor with a loud thump as the

robber climbed over a counter. The robber collected cash

from several drawers, stuffed the money into a bag and fled

from the bank with the cash and his gun.

 At about 3 p.m., before the robbery, an FBI special
 

agent named Gerald Mohan happened to be driving out of a

parking lot not far from the bank. For plausible reasons,

unrelated to the bank robbery, Mohan began to follow an

 -4-

Oldsmobile that turned out to be registered to Kirvan. Soon,

the Oldsmobile stopped, and a passenger wearing a rain hat

left the car, transferred to a Chevrolet, and both cars were

driven back toward the bank. Mohan briefly lost contact with

the cars and then located the Chevrolet leaving the bank

parking lot. As Mohan's car passed the Chevrolet going in

the opposite direction, he saw in the driver's seat a man

wearing a rain hat.

 Mohan later selected Kirvan's photograph from an array

as the man whom Mohan had seen in the Chevrolet leaving the

bank. Through other witnesses, there was evidence that the

driver and another man had abandoned the Chevrolet (which was

stolen) around 3:30 p.m. and switched to another car; one

young witness to the switch of cars testified that one of the

individuals who left the Chevrolet looked "Portuguese." The

police later discovered a bag and a police-band radio scanner

in Kirvan's Oldsmobile.

 On October 3, 1991, the grand jury handed down an

indictment charging Kirvan with armed bank robbery and using

or carrying a firearm during a crime of violence. After a

six-day trial, the jury returned guilty verdicts on both

counts. Pursuant to Fed. R. Crim. P. 29(c), Kirvan filed a

motion for judgment of acquittal. The district court judge

denied the motion as to the bank robbery count but granted a

judgment of acquittal on the firearms count. On the latter

 -5-

count, the trial judge ruled that there was insufficient

evidence for a jury to conclude that a genuine firearm was

carried during the robbery.

 Kirvan's first argument on appeal is that a statement

made by the prosecutor during summation was improper. The

statement concerned Mohan's ability to identify the driver of

the oncoming Chevrolet where the distance between Mohan's car

and the other car was approximately 3 to 4 feet and both cars

were travelling in opposite directions between 30 and 35

miles per hour. The prosecutor said to the jury, "I'm not

going to talk in terms of feet or seconds or milliseconds. I

want you to put yourselves in the place that [Mohan] was in."

As defense counsel did not object to this statement during

trial, the question is whether allowing it to stand was plain

error. United States v. Mateos-Sanchez, 864 F.2d 232, 240-41
 

(1st Cir. 1988).

 Kirvan's brief relies primarily on cases that forbid so-

called "golden rule" arguments in which plaintiffs or

prosecutors ask the jury to put itself in the place of the

victim. E.g., Forrestal v. Magendantz, 848 F.2d 303, 309
 

(1st Cir. 1988). But "golden rule" cases do not apply where,

as here, the jury is asked to put itself in the place of an

eyewitness. In this situation, the invitation is not an
 

improper appeal to the jury to base its decision on sympathy

for the victim but rather a means of asking the jury to

 -6-

reconstruct the situation in order to decide whether a

witness' testimony is plausible.

 Kirvan also asserts that the prosecutor engaged in

impermissible vouching for the credibility of Mohan. Mohan

had been attacked vigorously on cross-examination with

questions designed to suggest that his reasons for following

the Oldsmobile were fictitious, that he had not had time to

see Kirvan's face, and that in other respects he lacked

credibility. In summation, the prosecutor spoke favorably of

Mohan, saying to the jury:

 " . . . It tells you something about his
 professional instincts; they turned out
 to be right. Tells you something about
 his sense of duty. It tells you he
 cared, that he gave a damn, that he got
 himself involved.

 He didn't wait or let someone else worry
 about it. You saw him on the stand
 cross-examined for how many hours. You
 saw the attempt to condemn him, to
 criticize him, to embarrass him, to
 humiliate him, to imply incompetency, to
 imply deceit.

 I suggest to you that Gerry Mohan
 should not be condemned; he should be
 commended. That he shouldn't be
 criticized; he should be applauded. And
 he shouldn't be embarrassed or
 humiliated. He should be proud, and you
 should be proud of him." 

 This argument does not constitute improper vouching; the

prosecutor did not assert his own opinion of Mohan's veracity

as a witness. If any criticism could be made, it is that the

"let someone else worry" and "commended . . . applauded"

 -7-

commentary by the prosecutor is inappropriate cheerleading;

but this is hardly plain error, and, given the assault on

Mohan's integrity, the remarks may be fair comment.1 As for

the prosecutor's argument that events proved Mohan's

instincts to be sound, it may well be false logic from a

philosopher's standpoint but it is perfectly good folk wisdom

and is neither an appeal to emotion nor personal vouching.

 Finally, Kirvan argues that the prosecutor engaged in

impermissible conduct in recounting testimony. As already

noted, a young witness, actually one called by the defense,

described the driver of the Chevrolet as appearing

"Portuguese." During closing argument, the prosecutor told

the jury:

 "[The witness] also said that the man, to
 him, looked like his ancestry was
 Portuguese. I ask you to look at Paul
 Kirvan. Imagine him with his hair a
 little longer like it is in the photos.
 Imagine him with his skin a little more
 tanned like it is in this photo. Imagine
 him with a mustache, and imagine him with
 a beard that you can see from your jury
 box. Imagine him with a growth of a day
 or so of beard and ask yourselves whether
 [the witness'] characterization--although
 it may not have been technically
 accurate, ask yourselves whether it was
 descriptively accurate."

 

 1In his summation, defense counsel called Mohan a liar
and deceptive, stupid or both. While these remarks followed
the prosecutor's, they reflect the thrust of defense
counsel's earlier cross-examination of Mohan.

 -8-

No objection to these comments was made at trial. On appeal,

Kirvan does not claim that allowing the witness' response was

error. However, Kirvan contends that prosecutor's statement

(quoted above) during closing argument either invited the

jury to speculate about identity based on a vague criterion

or was racially inflammatory and deprived the defendant of a

fair trial in violation of the United States Constitution.

 There may be some force to the notion that

"look[ing] . . . Portuguese" is not much of a criterion for

identification, although the description came from a defense

witness. But defense counsel had ample opportunity in

closing argument to point out this weakness to the jury. The

defense brief on appeal imaginatively refers us to cases that

preclude a jury from viewing an infant to determine

paternity; but that rule is not followed everywhere and rests

in part on considerations of policy. In any event, counsel

did not object to the prosecutor's statement at the time it

was made, and the statement is not so vague or misleading as

to constitute plain error.

 The claim that the statement was a racial slur is more

serious in that the "[r]acial fairness of the trial is an

indispensable ingredient of due process and racial equality a

hallmark of justice." United States v. Doe, 903 F.2d 16, 25
 

(D.C. Cir. 1990). However, the prosecutor's statement was

not in fact a racially inflammatory remark; it was a

 -9-

permissible, "unembellished reference to evidence of race [or

ethnicity] simply as a factor bolstering an eyewitness

identification of a culprit." Id. Indeed, we think that
 

this charge against the prosecutor should not even have been

made.

 The government's cross-appeal presents a far more

difficult question. Following the jury verdict of guilt on

the second count (carrying a firearm during a crime of

violence), the court granted a judgment of acquittal finding

"no evidence that the defendant actually carried a firearm,

as opposed to a toy gun." On appeal, we examine the evidence

in the light most favorable to the government. If a rational

trier of fact could have concluded that every essential

element of the crime charged was proved beyond a reasonable

doubt, then the issue should have been left to the jury.

United States v. Medina-Garcia, 918 F.2d 4, 6-7 (1st Cir.
 

1990).

 The firearm statute, 18 U.S.C. 924(c), provides in

relevant part that whoever carries a firearm during the

commission of a crime of violence shall be sentenced to an

additional five years' imprisonment (or more if the weapon is

of a type here not involved). It is common ground that the

gun need not be proved to be loaded or operable in order to

convict, United States v. Gonzalez, 800 F.2d 895, 899 (9th
 

Cir. 1986), but that a toy or replica will not do. United
 

 -10-

States v. Westerdahl, 945 F.2d 1083, 1088 (9th Cir. 1991).
 

The district court summed up the evidence and held it

inadequate to permit a reasonable jury to find, beyond a

reasonable doubt, that Kirvan carried a real gun as opposed

to a toy.

 The government's riposte is to point to a square holding

by then Circuit Judge Scalia in Parker v. United States, 801
 

F.2d 1382, 1385 (D.C. Cir. 1986), cert. denied, 479 U.S. 1070
 

(1987), that non-expert testimony affirming that a robber

used a gun is enough. The holding was followed without much

discussion by the Fourth Circuit in a case where five

witnesses had described the object as a gun. United States
 

v. Jones, 907 F.2d 456 (4th Cir. 1990), cert. denied, 111 S.
 

Ct. 683 (1991). Kirvan in turn points us to cases which, in

upholding convictions under this or similar statutes,

recounted or relied upon testimony from a firearms expert or

at least a witness who saw the robbery and claimed to know

about weapons. E.g., United States v. Buggs, 904 F.2d 1070
 

(7th Cir. 1990); Westerdahl, 945 F.2d at 1088.
 

 If fake guns were extraordinarily rare in bank

robberies, it might be fairly easy, absent affirmative proof,

to dismiss the possibility that the gun was a toy. The jury

had no actual data, which might be inadmissible in any

 -11-

event,2 although it does have considerable latitude in

making intuitive judgments about how the world works. United
 

States v. Guerrero-Guerrero, 776 F.2d 1071, 1075 (1st Cir.
 

1985), cert. denied, 475 U.S. 1029 (1986). Nor does policy
 

tilt the balance, as it might if we faced an issue where the

government had ready access to direct evidence (e.g., whether
 

a bank is federally insured) and no excuse for leaving the

matter in doubt. Of course, Kirvan has such access but we

will not decide the matter by relying upon his failure to

produce the gun for inspection.3 

 We need not decide here whether the government's burden

could be met merely by unembellished lay testimony that "the

robber carried a gun." In this instance, the object was

identified by two witnesses as a gun; one said that it was

black and had a five inch barrel and the other, who was

closer, supplied more detail: he said that it appeared

"shiny, silver" in color; that it was "[l]arge, very large

 

 2See 1 McCormack, Evidence 210, at 949-50 (4th ed.
 
1992) (cases discourage mathematical proof and probability
data in criminal cases). Such data may exist. E.g.,
 
Washington Post, October 2, 1986, p. C1 ("Neil Hurley, chief
 
of the grand jury section of D.C. Superior Court, said that
at least 10 percent of the armed robbery cases that he sees
involve fake guns.").

 3The problem with an adverse inference is the Fifth
Amendment's bar against compelled self-incrimination. See
 
Griffin v. California, 380 U.S. 609 (1965). But cf. Barnes
 
v. United States, 412 U.S. 837 (1973) (upholding an
 
instruction that unexplained possession of stolen property
permits an inference of knowledge).

 -12-

for a handgun"; and that when it fell to the floor, it made

"[a] very loud noise. Heavy object hitting the floor."

 Without deciding whether less would do, we think that

this detail permitted a rational jury to conclude that this

was a "real" gun: it was a plausible size, colored like a

real gun, and quite heavy. One witness could easily describe

gun metal as black and another as silver. Although some toy

guns might be of similar size and color, the heavy weight

certainly would not be as common in a toy. And while a good

replica might still fool a witness at a distance, the chances

of error decline where, as here, the witness saw the gun,

stationary and at a close distance, for a least half a

minute.4

 In sum, we think that the jury, which concluded that the

object was a real gun "beyond a reasonable doubt," cannot be

deemed irrational. We understand why the trial judge came to

the opposite view. But judgments of acquittal are subject to

de novo review, United States v. Reed, 977 F.2d 14, 18 (1st
 

Cir. 1992), and if deference is owed to anyone it is to the

jury. In Judge Prettyman's widely cited formulation, "if a

reasonable mind might fairly have a reasonable doubt or might

fairly not have one, the case is for the jury, and the

 

 4Kirvan says that a robber would be unlikely to leave a
real gun unattended on the floor for 30 seconds; the
government says that a robber would not leave a replica
unconcealed for any length of time. These inferences, if
they do not precisely cancel out, are not conclusive.

 -13-

decision is for the jurors to make." Curley v. United
 

States, 160 F.2d 229 (D.C. Cir.), cert. denied, 331 U.S. 837
 

(1947). 

 For the reasons stated above, the judgment of conviction

on count one is affirmed; the directed judgment of acquittal
 

on count two is set aside and the jury verdict on that count
 

is reinstated; and the case is remanded to the district court
 

for resentencing.

 -14-