*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

Nos. 24-CF-0428 & 24-CF-0496

DELONTA STEVENSON & VORREZE RICARDO THOMAS, APPELLANTS,

v.

UNITED STATES, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(2021-CF1-000968 & 2021-CF1-000967)

(Hon. Marisa J. Demeo, Trial Judge)

(Argued December 18, 2025                                    Decided March 19, 2026)

*Brian D. Shefferman* for appellant Stevenson.

*Cecily E. Baskir* for appellant Thomas.

*Mary C. Fleming*, Assistant United States Attorney, with whom *Jeanine Ferris Pirro*, United States Attorney, and *Chrisellen R. Kolb*, *Miles Janssen*, and *Zachary Horton*, Assistant United States Attorneys, were on the brief, for appellee.

Before BECKWITH, MCLEESE, and DEAHL, *Associate Judges*.

DEAHL, *Associate Judge*: Appellants Delonta Stevenson and Vorreze Thomas were charged with various counts stemming from the shooting of three occupants of a car: Troy Williams, James Fye, and Terrence Allen. Williams and Fye survived

the shooting, but Allen was killed. Both appellants were convicted of assault with intent to kill as to Williams and Fye, first-degree murder as to Allen, and a variety of related offenses. During their joint jury trial, the government relied on extensive surveillance video footage and other circumstantial evidence to identify Stevenson and Thomas as the two men who shot and killed Allen. The government also relied on expert testimony from a firearms examiner that purported to match a firearm, found abandoned near the men's crashed vehicle after a police chase, to the casings left at the scene.

Stevenson and Thomas challenge their convictions and contend that it was reversible error for the trial court to admit the firearms examiner's testimony. Stevenson also contends the trial court erroneously limited defense counsel from arguing in closing about the societal prevalence of a blue puffer jacket worn by one of the shooters that resembled a jacket that Stevenson wore in various photographs admitted into evidence. As we explain below, we assume for the sake of argument that the trial court committed the first error and agree with Stevenson that it committed the second, but we nonetheless conclude that any errors were harmless. We thus largely affirm appellants' convictions, with several exceptions noted below regarding some of the firearm charges that the government agrees should be vacated.

## I. Background

We begin a few months before the shooting at issue, when appellant Delonta Stevenson was shot by an unknown assailant in November 2020. Stevenson and his girlfriend, Brianca Phillips, believed Troy Williams was the culprit, and Williams knew as much. Williams started feeling "a little tension" with Stevenson after the shooting and began avoiding the Stanton Glenn apartment complex, where both Williams's mother and Stevenson lived.

After a few months passed, Williams braved a trip to Stanton Glenn to check on his mother and take her to the grocery store. He asked Terrance Allen for a ride and to bring a gun because he was still worried about his fallout with Stevenson. Allen picked up Williams and brought a friend, James Fye. When the group arrived at Stanton Glenn, Williams tried talking to some "dudes in the parking lot," though "a couple of them walked away . . . in different directions." That led Williams to believe it was still dangerous for him to be there, so he, Allen, and Fye quickly retrieved Williams's mom and took her to a grocery store.

Around that same time, several text messages were sent to Brianca Phillips's cell phone indicating that Williams was at Stanton Glenn. Phillips's phone then made a twenty-seven-second call to somebody dubbed "Lil V" in her phonebook— a nickname for Vorreze Thomas. Surveillance video from a nearby gas station

showed a man who the government maintained was Thomas taking a twenty-seven-second phone call around that same time. He was wearing red sneakers, tight jeans, a black face mask pulled down below his face, and a navy parka jacket with a fur-lined hood. After the call, the man left the gas station in a green Volvo SUV, which Thomas was known to drive.

About twenty minutes later, Williams returned to Stanton Glenn with his mother, Allen, and Fye, and the events that followed were captured on surveillance footage from the Stanton Glenn complex. That footage shows the same green Volvo from the gas station pulling into the complex seconds after Allen's car. The driver of the green Volvo—still wearing the same outfit he wore at the gas station—parked near a man standing by the parking lot wearing a blue puffer jacket, dark pants with red stripes, and a black ski mask or "balaclava." The government maintained this was Stevenson. The video shows the Volvo driver grab a tactical rifle with two grips from the backseat of his car while the man in the blue jacket holds a pistol, and the two of them look toward the car that Williams was riding in. Meanwhile, Williams dropped his mother off at her apartment, got back in Allen's car, and drove toward the apartment complex's exit. The two men the government maintained were Stevenson and Thomas then got into the green Volvo and likewise drove toward the complex's exit.

As Allen's car reached the exit, Williams saw the green Volvo speeding toward them and told Allen to drive faster, but a parked car whose driver had briefly exited was blocking the exit path. The surveillance footage shows Allen trying to drive around the parked car, but he hit a concrete bollard separating the lanes of incoming and outgoing traffic. The green Volvo then pulled up directly behind Allen's crashed car, and the Volvo's occupants fired over thirty rounds into the back of the car. Williams testified that he tried firing back with the gun Allen brought, but it jammed. Allen was shot and killed. Fye and Williams were also shot, but both survived.

Special police officer Adjawo Sani was on duty near a kiosk positioned at the entry/exit of the Stanton Glenn complex, and he witnessed the shooting. After the shooting, Sani fired three shots from his service pistol at the Volvo as it sped away. It just so happened that at the same time Sergeant Michael Millsaps of the Metropolitan Police Department was driving by Stanton Glenn in the opposite direction of the Volvo, and surveillance video shows him making a U-turn and chasing after the Volvo. Millsaps explained that he chased the Volvo for about four minutes before he eventually lost track of it in a residential area. After shaking Millsaps, the green Volvo promptly crashed into a nearby parked car, and its occupants bailed out.

A witness heard the crash and saw two men in dark clothing exit the car and run towards a wooded area, and the man exiting from the passenger side was carrying a rifle. Minutes later, surveillance cameras at a bank drive-through show the same men, wearing the same distinctive outfits seen on video at Stanton Glenn, approaching the bank from the direction of the wooded area without the rifle. The pair walked through the bank drive-through and across the parking lot of an adjoining Safeway. They then boarded a metrobus, as seen on the bus's surveillance video.

Stevenson and Thomas were arrested and charged with: (1) conspiracy to murder Williams; (2) first-degree murder while armed of Terrence Allen; (3) two counts of assault with intent to kill while armed of Troy Williams and James Fye; (4) and three counts of possession of a firearm during a crime of violence (PFCV). Stevenson was also charged with two counts of unlawful possession of a firearm (prior conviction and offenses committed while on release), D.C. Code §§ 22-4503(a)(1), 23-1328(a)(1). Thomas was also charged with carrying a rifle or shotgun outside of the home or place of business. *Id.* § 22-4504(a)(1), (a-1).

The trial focused on whether Stevenson and Thomas were the shooters in the conspicuous green Volvo who wore the distinctive clothing depicted in the video footage. Fye and Williams both testified. Williams identified Stevenson as the man

in the blue puffer jacket seen in the Stanton Glenn surveillance videos on the morning of the shooting. He explained that when he came back from the grocery store to drop his mother off he briefly exchanged words with Stevenson, got a bad feeling, then rushed his mother inside. Williams also identified Thomas as Stevenson's nephew and explained that he had previously seen Thomas driving a green Volvo around Stanton Glenn.

The government presented surveillance videos from the gas station, Stanton Glenn, the bank, the Safeway, and the metrobus. The videos showed two men wearing the same distinctive outfits—a navy jacket with a fur-lined hood and red sneakers on one, a blue puffer jacket and red-striped pants on the other—in the events surrounding the shooting, and their faces were visible or partially visible at times. Several cell phone and social media records showed Stevenson and Thomas wearing jackets like the ones the shooters were wearing in the surveillance videos and showed Thomas wearing the distinctive red sneakers. Social media chat logs corroborated Thomas's phone number as the "Lil V" that Phillips's phone placed a twenty-seven-second call to on the morning of the shooting. The government also introduced cell-site location information that showed Thomas's phone number had used cell towers in a manner consistent with his phone being near the gas station, Stanton Glenn, the crashed Volvo, and the bank during the times the man in red sneakers was at those locations.

The government also presented testimony about physical evidence tied to the shooting. For example, a cell phone, a black face mask, and a juice bottle were found in the crashed Volvo. Police also recovered a two-gripped tactical rifle from the wooded area between the crashed Volvo and the bank drive-through. DNA samples taken from the Volvo, the items inside the Volvo, and the tactical rifle were all tested against samples from Stevenson and Thomas. Without getting into too great of detail, the government's DNA expert testified to a high degree of certainty that Thomas and Stevenson's DNA was recovered from a variety of those items, including those inside the Volvo and the rifle recovered near it.

Finally, the government presented an expert on firearm toolmarks, Chris Monturo, who testified to a high degree of likelihood that the spent casings found at the Stanton Glenn scene were fired from the rifle recovered near the crashed Volvo. The precise contours of that testimony relate to the central dispute in this appeal, and we detail that testimony more thoroughly in the analysis that follows.

During closing arguments, Stevenson and Thomas did not dispute that the two men seen in each of the various surveillance videos were the shooters. Their defense was simply that they were not those two men. They argued that Williams was a biased witness and that his testimony and identifications were not credible because he got a "sweetheart deal" from the government in relation to his own pending

assault with a deadly weapon charge. They also tried to cast doubt on the DNA evidence given the complications of testing samples from an uncle and nephew. As relevant to one issue on appeal, Stevenson also argued in closing that there was nothing particularly distinctive about the blue puffer jacket one of the shooters was wearing, though the trial court sustained an objection and struck a portion of that argument, as detailed further below.

The jury ultimately convicted Stevenson and Thomas on all charges. They now appeal.

## II. Analysis

Both appellants challenge the trial court's decision to permit the government's firearms and toolmark examiner to testify that the spent cartridges found at the scene were "extremely likely" to have been fired from the rifle found near the abandoned Volvo. They argue that our precedents to date have concluded that the state of the science does not permit experts to draw such definitive conclusions from toolmark evidence. Stevenson also challenges the trial court's decision to limit his counsel's line of closing arguments about the ubiquity of blue puffer jackets.

We address these arguments in turn before addressing the other firearms convictions that the government agrees should be vacated.

*A. The firearms and toolmark examiner's testimony*

1. Additional background

Before trial, the government notified appellants that it planned to call Monturo as an expert witness in firearms and toolmark examination. The government proffered that Monturo would testify that there was "extremely strong support" for the conclusion that the spent casings found at Stanton Glenn came from the tactical rifle recovered near the crashed Volvo. The government also previewed that Monturo would testify that there was extremely strong support to conclude that a casing recovered some months before the shooting at issue was fired from the same rifle, and that casing was found outside of an apartment complex where Thomas had recently hosted a party.

The appellants sought to exclude Monturo's testimony in its entirety, contending that firearms and toolmark analysis is not sufficiently reliable to support Monturo's conclusions, and they argued in the alternative that the trial court should preclude Monturo from offering such a definitive opinion on that matter. As we have repeatedly held, "a firearms and toolmark expert may not give an unqualified opinion, or testify with absolute or 100% certainty, that based on ballistics pattern comparison matching a fatal shot was fired from one firearm, to the exclusion of all other firearms." *Gardner v. United States*, 140 A.3d 1172, 1184 (D.C. 2016); *see*

*also Williams v. United States*, 210 A.3d 734, 740 (D.C. 2019) (same, quoting *Gardner*).

The government countered that Monturo's testimony would comply with this court's rulings in *Gardner* and *Williams*. That is, Monturo would not opine with certainty that the spent casings were definitely fired from the recovered rifle. He would instead testify only that (1) there was "extremely strong support" for that conclusion; (2) there was "extremely weak support" for concluding that a different firearm fired the cartridges; (3) he would "not state his expert opinion with any level of statistical certainty, much less 100% or absolute certainty"; and (4) he would "not render his opinion 'to the exclusion of all other firearms' or use the phrase 'to a reasonable degree of scientific certainty.'" To the extent that any of this testimony would run afoul of our holdings in *Gardner* and *Williams*, the government further argued that the state of ballistics science regarding firearms and toolmark analysis had evolved since we issued those decisions, so that Monturo's opinions were adequately supported by current science.

The trial court determined Monturo's proposed testimony was permissible under existing case law so long as Monturo did not offer "an unqualified opinion that specific bullets came from a specific gun to the exclusion of other firearms." It did not address the government's alternative argument that the science had advanced

to a stage where experts could testify about ballistics matches to a degree of certainty beyond what *Gardner* and *Williams* permitted.[1]

After that initial ruling, this court decided *Geter v. United States*, which reiterated that it is impermissible for an examiner to testify, "without reservation, that the 'unique' marks from the inside of [a] gun transferred to the shell casings recovered" because the testimony effectively "assert[ed] a basis for linking specific shell casings to a specific gun." 306 A.3d 126, 132-35 (D.C. 2023). The trial court then amended its ruling and required the government to ensure Monturo's testimony would be compliant with *Geter* and again declined to consider the government's renewed arguments that current science had evolved since we decided *Gardner* and *Williams*.

---

[1] At least one trial court in the District fairly recently ruled, after conducting a thorough evidentiary hearing, that the then-present state of ballistics science did not support this same expert's ability to use the phrases "extremely strong" and "extremely weak" in firearms comparison. *See United States v. Green*, No. 2018-CF1-4356, 2024 D.C. Super LEXIS 8, at *62-64 (D.C. Super. Ct. Apr. 1, 2024) (precluding Monturo from testifying that there was "extremely strong support" or "extremely weak support" for his conclusion that a particular firearm fired ammunition). That ruling is perhaps in some tension with an earlier trial court ruling from our federal district court permitting Monturo to testify that a bullet was "fired" from a particular firearm, provided he did "not state his expert opinion with any level of statistical certainty" and he would not use phrases like "to the exclusion of all other firearms" or "to a reasonable degree of scientific certainty" when describing his confidence levels. *United States v. Harris*, 502 F. Supp. 3d 28, 44 (D.D.C. 2020). We ultimately express no view on this topic.

As the government previewed, Monturo testified at trial that there was "extremely strong support for the proposition that" toolmarks on the recovered casings came from the recovered rifle and "extremely weak support" that they came from a different source. Monturo also agreed that his conclusions were "not based on a statistically derived or verified measure" and thus were not made with 100% certainty and that there is "no generally accepted statistical way to measure or convey the weight of the evidence in firearms and toolmarks" analysis. When asked if he could be sure that the spent casings were fired from the recovered rifle as opposed "to the exclusion of all other sources," he replied he could not because "[t]hat would be implying that [he] looked at every single gun ever made, and that simply is not feasible."

On appeal, Stevenson and Thomas argue that Monturo's testimony that there was "extremely strong" support for his opinion that the spent casings were fired by the recovered rifle, and "extremely weak" support for the view that any other firearm fired them, contravened our precedents. That is because, in appellants' view, it was "functionally equivalent to the kind of unqualified, unreliable testimony" this court precluded in *Gardner*, *Williams*, and *Geter*. Relatedly, they contend that Monturo effectively disavowed any genuine uncertainty when he explained his only doubt stemmed from his inability to "look[] at every single gun ever made," thus implying he had only the most theoretical of doubts. In effect, they argue that Monturo

conveyed to the jury that he reached an unqualified conclusion that the rifle fired the bullets in this case. The government counters that (1) Monturo's testimony was consistent with our holdings in *Gardner*, *Williams*, and *Geter*, (2) current science supports his testimony even if it was not compliant with those earlier holdings, and (3) any error in permitting this testimony was harmless given the "overwhelming evidence of appellants' guilt."

### 2. Any error in admitting Monturo's testimony was harmless

We agree with the government on its last point—that any error in permitting Monturo's testimony was harmless. We do not resolve the questions of whether Monturo's testimony ran afoul of our precedents or whether it has sufficient backing in current ballistics science.

Assuming Monturo's testimony was erroneously admitted, or that he should have been precluded from offering opinions as conclusively as he did, those errors are not grounds for reversal if they were harmless. *Gardner*, 140 A.3d at 1185. Such evidentiary errors are harmless if we can say, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Id.* at 1186 (quoting *Jones v. United States*, 27 A.3d 1130, 1140 (D.C. 2011)).

We do not see any reasonable probability that Stevenson or Thomas were prejudiced by Monturo's testimony. The trial in this case centered on whether Stevenson and Thomas were the two men in the green Volvo who unloaded dozens of rounds into Allen's vehicle. The government presented an incredibly strong case that they were, and the ballistics evidence connecting spent casings to the firearm found by the crashed Volvo was minimally relevant to that case. The government's DNA expert testified to an extraordinary degree of scientific certainty that each man's DNA was recovered on the abandoned rifle and on various items from inside the crashed Volvo that fled the police. The government also presented evidence from Williams and Officer Sani that Thomas was a regular driver of the green Volvo. It also adduced cell-site location information and surveillance footage linking Thomas to the gas station where his phone received a twenty-seven-second call at the same time Stevenson's girlfriend made a call to "Lil V" after being alerted that Williams was at the Stanton Glenn complex. In addition, social media records tied Thomas to the phone number and further supported that he went by the nickname, "Lil V." There was also extensive surveillance video depicting both men before entering and after exiting the Volvo, plus witness testimony identifying the man in the blue puffer jacket as Stevenson, and sufficiently clear images of the other man's face to permit the jury to draw its own in-court comparison to Thomas.

Thomas in particular counters that there were substantial holes in the government's case as to his identity, including that: (1) no witness testified to seeing him at Stanton Glenn on the day in question, (2) no witness ever directly identified him as the person depicted in the various surveillance videos, (3) there was incongruous testimony about which of the men was supposedly the driver and which was the passenger, and (4) the witness who saw the men bail out of the Volvo after the crash described features of both men that were inconsistent with Thomas. The critical problem for appellants is that even if we viewed those as serious gaps in the government's case against Thomas—and even if we discerned similar holes in the government's case against Stevenson—the ballistics evidence did not meaningfully fill those gaps. That is, the ballistics evidence had little bearing on whether Stevenson and Thomas were the men in the green Volvo, which was the only meaningful dispute in this case. And so we see no reasonable probability that Monturo's testimony swayed the jury's verdicts.

Consider it this way: if any juror had lingering doubts that Stevenson and Thomas were the men in that green Volvo based on the totality of evidence aside from the ballistics evidence, the ballistics evidence itself could not plausibly have assuaged those doubts. That hypothetical juror would have had to think it was reasonably possible that two other men were the occupants of the green Volvo who unloaded on Allen's car, despite the strong evidence that those men were Stevenson

and Thomas. And if our hypothetical juror entertained a reasonable doubt as to that, learning that the gun abandoned near the crashed Volvo was used in the shooting could not have alleviated that doubt—"so what," they would think, the recovered rifle "still might have been fired by those other men."[2] It follows then, if the jury identified Stevenson and Thomas as the men in that green Volvo, Stevenson and Thomas were inescapably guilty of the charged offenses, no matter what the ballistics evidence was.

The only way the ballistics evidence itself could have meaningfully moved the needle in favor of guilty verdicts is by providing some additional evidence that the men in the green Volvo committed the shooting. But there was no serious question or dispute about that at trial, no doubt because it was plain as day from the video evidence. The government presented video evidence from multiple angles that clearly shows the green Volvo pull up right behind Allen's car, its occupants then unload countless bullets into Allen's car, and they then pull out of the complex just as Sergeant Millsaps drives by and makes a U-turn to chase them.

---

[2] There is no dispute that Monturo could have permissibly testified, at a minimum, that the toolmarks on the spent casings were at least consistent with them having been fired from the recovered rifle. So when assessing harm, we are only assessing the potential impact of Monturo testifying with greater certainty than that.

In short, the ballistics evidence tying the abandoned rifle to the shooting was minimally relevant to the identification issues that the jury was tasked with resolving. The ballistics evidence was merely a bow on top of the irrefutable evidence that the men in the green Volvo committed the shooting, which was an inescapable and undisputed conclusion based on evidence that was independent from the ballistics, and the strong evidence that Stevenson and Thomas were those men. We are confident that, assuming the trial court erred to some extent in permitting Monturo's testimony, that error did not in any way contribute to the jury's verdicts.

*B. Preclusion of defense argument on the ubiquity of blue puffer jackets*

We next turn to Stevenson's argument that the trial court erroneously precluded him from expounding on the ubiquity of blue puffer jackets by striking a line of his closing argument to that effect. The government objected that this argument violated the so-called "golden rule," which prohibits a line of argument that "improperly 'encourages the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence.'" *See United States v. Moreno*, 947 F.2d 7, 8 (1st Cir. 1991) (quoting *Forrestal v. Magendantz*, 848 F.2d 303, 309 (1st Cir. 1988)); *see also Caudle v. District of Columbia*, 707 F.3d 354, 359 (D.C. Cir. 2013) ("A golden rule argument . . . asks jurors to place themselves in the position of a party" (citation omitted)). Stevenson

contends that his counsel "merely asked the jury to apply their common experience" to the case at hand, and that the trial court's decision prevented him from making a point essential to the defense and gave the jury an impression that they could not draw upon common knowledge in deliberations. For its part, the government offers no defense of the trial court's ruling on appeal—it contends only that any error was harmless.

We review a trial court's decision to restrict closing arguments under an abuse of discretion standard. *Haley v. United States*, 799 A.2d 1201, 1207 (D.C. 2002). We agree with Stevenson that the trial court abused its discretion by striking this line of argument and by seemingly precluding him from pointing to the ubiquity of puffer jackets as a weakness in the government's case. There was nothing improper about that argument. It did not appeal to the jurors' sympathies or ask them to put themselves in Stevenson's shoes; it simply asked them to draw on their common experiences to conclude that the shooter's jacket was not particularly distinctive, which is perfectly permissible. *See Covington v. United States*, 278 A.3d 90, 99 (D.C. 2022) ("Jurors need not check their common sense at the courthouse doors, but are permitted 'to use the saving grace of common sense and their everyday experience to draw reasonable inferences from the evidence presented.'" (quoting *Long v. United States*, 156 A.3d 698, 714 (D.C. 2017) (internal quotation marks and citation omitted))); Criminal Jury Instructions for the District of Columbia,

No. 2.104 (5th ed. 2026) ("When you consider the evidence, you are permitted to draw . . . such reasonable inferences as you feel are justified in the light of your experience.").

We nonetheless agree with the government that the error was harmless. Even after the trial court struck his initial argument about the ubiquity of blue puffer jackets, it permitted Stevenson's counsel to elucidate what was effectively the same point: he repeatedly argued that the blue puffer jacket was not a meaningful identifier, stressing "how do you know who is wearing [that jacket]. You don't know. It can be a coincidence . . . . It could be anybody . . . . [W]e don't know how many people have puffy jackets." Despite the trial court's erroneous preclusion of one line of argument, Stevenson's counsel ably made the point that many people might wear dark, puffy coats in the winter. And the jurors were further instructed that they could draw reasonable inferences from their own experiences. We thus see no reasonable probability—even combined with the assumed previous error in admitting ballistics evidence—that this error affected the jury's verdicts.

*C. Merger of PFCV convictions and vacatur of another firearm conviction*

Stevenson and Thomas argue that each of their three PFCV convictions should merge into a single conviction. The government concedes the point, and we agree that those counts should merge. *Matthews v. United States*, 892 A.2d 1100, 1106

(D.C. 2006) ("[M]ultiple PFCV convictions will merge . . . if they arise out of a defendant's uninterrupted possession of a single weapon during a single act of violence."). We therefore remand with instructions for the trial court to vacate two of the PFCV convictions as to each of the appellants.

Finally, the United States asks us to vacate Thomas's conviction for carrying a rifle or shotgun outside of his home or place of business, positing that this statutory prohibition violates the Second Amendment. Thomas, perhaps obviously, does not oppose that motion. Because no party contests it, and because the District of Columbia has not defended the constitutionality of this statute after we offered it the opportunity to do so, *see* D.C. App. R. 44(b), we remand with instructions to vacate Thomas's conviction for carrying a rifle or shotgun outside of his home or place of business under D.C. Code § 22-4504(a)(1), (a-1).

### III. Conclusion

For those reasons, we affirm appellants' convictions with the following caveats: We remand with instructions for the trial court to vacate two PFCV convictions for each of the appellants—leaving each with just one PFCV conviction—and further instruct the trial court to vacate Thomas's conviction for carrying a rifle or shotgun outside of his home or place of business.

*So ordered.*