# United States Court of Appeals
## For the First Circuit

No. 09-1302

ROBERT GRANFIELD,

Plaintiff, Appellee,

v.

CSX TRANSPORTATION, INC.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Boudin, Circuit Judges.

Michael B. Flynn, with whom Carolyn M. Blake, Seth C. Turner, and Flynn & Wirkus, P.C., were on brief for appellant.
Patrick J. Donoghue, with whom Collins, Collins & Donoghue, P.C., was on brief for appellee.

March 12, 2010

**TORRUELLA**, **Circuit Judge**. Defendant-appellant CSX Transportation, Inc. ("CSXT") is appealing from the district court's denial of its motion for judgment as a matter of law or a new trial, after a jury awarded $250,000 to plaintiff-appellee Robert Granfield ("Granfield"), based on a finding that CSXT violated both the Federal Employer's Liability Act ("FELA"), 45 U.S.C. § 51 et seq., and the Locomotive Inspection Act ("LIA"), 49 U.S.C. § 20701 et seq. Granfield, a locomotive engineer employed by CSXT, claimed he developed lateral epicondylitis,[1] or "tennis elbow," as a result of having to manipulate defective controls found in the cabin of his locomotive. After a ten-day trial and the district court's denial of several dispositive motions by CSXT, the jury returned a verdict in favor of Granfield.

CSXT appeals from the judgment and claims the district court erred in: (1) not dismissing the case under the FELA statute of limitations; (2) allowing Granfield's medical expert witness to testify on causation; (3) admitting a letter containing irrelevant and prejudicial statements, even though the district court overruled itself and eventually held the letter inadmissible; (4) refusing to order a new trial despite Granfield's counsel's allegedly improper statements at closing argument; and (5) denial

---

[1]  Lateral epicondylitis is defined as inflammation and pain over the outer side of the elbow involving the lateral epicondyle of the humerus usually resulting from excessive or violent twisting movements of the hand. Webster's Third New International Dictionary Unabridged 2356 (2002).

of its motions for a new trial or judgment notwithstanding the verdict based on the cumulative error doctrine. After careful review of each issue in this highly contested case, we find no error by the district court and therefore <u>affirm</u> the jury verdict.

## I. <u>Background</u>[2]

We begin by briefly describing Granfield's work history, the alleged condition of the equipment he was required to operate, and the statutory framework that governs this case.

Granfield was a railroad worker for over thirty years. From 1978 until April 2000, he worked as a locomotive engineer, road foreman, and trainmaster for Consolidated Rail Corporation and the Massachusetts Bay Transportation Authority. On April 1, 2000, he began working for CSXT as a locomotive engineer, primarily based out of Framingham, Massachusetts. On March 6, 2006, he underwent surgery in his right elbow, and has been unemployed since.[3]

While employed by CSXT, Granfield was required to operate almost exclusively the GP40 6200 series locomotives. As part of the normal operation of these locomotives, he manipulated an array of controls, among them the alerter buttons, brake levers, reverser, sander, throttle, and whistle. Of concern to us here are

---

[2] We present these facts in the light most favorable to the verdict.

[3] Granfield testified at trial that he was currently unemployed and that the last time he worked was on March 5, 2006.

the alerter buttons and throttles, which Granfield claims were defective and the cause of his injuries.[4]

The alerter is a device that triggers an audible warning that automatically sounds at various intervals while the locomotive is being operated, in order to prevent an engineer from falling asleep at the controls. This mechanism is reset by simply pressing a button. The throttle is important for locomotive engineers as it helps them adjust the speed of the locomotive. It works by regulating the output horsepower generated by the engine, which in turn influences the train's speed. The throttle is controlled by sliding its handle with no more force than is required to turn a door handle.[5]

Granfield testified that he had experienced problems with the throttles in the GP40 6200 locomotives since beginning to work for CSXT in 2000. Mainly, he complained that the placement of the throttle would not correspond with engine output, and as a result he had to "jiggle" the throttle handle back and forth until the desired speed was achieved.

---

[4] Although in his complaint Granfield cited other deficiencies with the locomotives he operated, at trial the weight of the evidence Granfield presented was aimed at proving that only the throttles and alerter buttons malfunctioned and caused his injuries.

[5] When functioning properly, which Granfield contends they were not.

Granfield also complained that the alerter was sounding too frequently, which caused him to push the alerter button more often than would normally be required. Depending on the model of the locomotive, these buttons were sometimes located in uncomfortable locations in the cabin and sometimes had to be "smacked" in order for them to deactivate the alerter.

It is unclear exactly when Granfield began to experience symptoms in his elbows. At his deposition, he stated that he had experienced pain in his left elbow in April 2003. During the trial, he testified that he began feeling pain in his left elbow around February or March 2003. He testified that his arm was aching and sore to the touch. He also testified at trial that his arm felt swollen and his little finger in both hands tingled, resembling a numbing sensation.

On May 28, 2003, due to the pain in his elbow and tingling of his little fingers, Granfield visited Dr. Chakraborty, a cardiologist who had treated him in the past for a heart condition. Granfield complained of pain, stiffness, aching, burning, tightness of the arm, and tingling in his small finger. Dr. Chakraborty examined Granfield's elbow and noticed "some kind of inflammation," but testified that he did not know what was causing the inflammation. Dr. Chakraborty then referred Granfield to an orthopedic surgeon -- Dr. Carl Spector -- for further treatment. Dr. Chakraborty testified at that he did not remember

whether Granfield mentioned that he thought his pain was related to his work at the time.

On July 8, 2003 Granfield paid a visit to Dr. Spector. During this visit, Dr. Spector noted that Granfield reported he had been experiencing symptoms in his left elbow for approximately eight months (i.e., since December 2002, which was inconsistent with Granfield's testimony). Granfield also informed Dr. Spector that his symptoms manifested themselves gradually and progressively worsened. After an examination and long discussion with Granfield, Dr. Spector diagnosed him with lateral epicondylitis in the left elbow.

Dr. Spector determined that Granfield's lateral epicondylitis was being caused by the repetitive back and forth manipulation of what he deemed to be "levers" inside the locomotive cabin. Granfield maintained throughout the trial that it was during this visit that he first became aware of the connection between his work activities and his injury.

After his July 8, 2003 visit, Granfield continued seeing Dr. Spector for followup treatment. During one of these visits, on January 21, 2005, Dr. Spector diagnosed Granfield with bilateral epicondylitis of the left and right elbows. In his report concerning this visit, Dr. Spector noted that Granfield should not continue working, and recommended physical therapy. After finishing his physical therapy course, Granfield was reevaluated by

Dr. Spector on March 4, 2005, and was found to be in good condition and suffering no pain.

By October 2005, however, Granfield's condition had deteriorated and he was suffering from significant pain rising from his right lateral epicondyle (right elbow). During his October 28, 2005 visit, Dr. Spector noted that Granfield had re-injured himself at work, and diagnosed him with recurrent severe lateral epicondylitis of the right elbow.

On March 6, 2006, Dr. Spector operated on Granfield's right elbow. Following the operation, Granfield's condition improved, although he still suffered from epicondylitis in his left elbow. In his notes concerning Granfield's visit on November 9, 2006, Dr. Spector mentioned that Granfield would be unable to continue to work as a locomotive engineer.

On June 19, 2006, Granfield filed a complaint against CSXT in the U.S. District Court for the Western District of New York. In it, he charged that CSXT required him to operate locomotives with malfunctioning equipment, including the alerters and throttles, which caused him to suffer his injuries. Granfield also averred that CSXT's failure to adequately maintain its locomotives was a violation of both FELA, 45 U.S.C. § 51 et seq., and LIA, 49 U.S.C. § 20701 et seq.

FELA regulates the liability of railroad common carriers who engage in interstate or foreign commerce, for injuries

sustained by their employees due to the carrier's negligence. Section 1 of the statute states that these interstate railroad carriers will be liable in damages "to any person suffering injury while he is employed by such carrier in such commerce." 45 U.S.C. § 51. In a FELA liability action by an employee against a railroad carrier, the principle of contributory negligence and diminution of damages applies. 45 U.S.C. § 53. Therefore, if an employee's injuries not only result from the carrier's negligence, but also from his own, the employee's damages "shall be diminished by the jury in proportion to the amount of negligence attributable to such employee." Id. This principle, however, will not apply if the employee's injury is found to have been contributed to by the carrier's violation of any statute enacted for the safety of its employees. Id.[6]

"Federal decisional law formulating and applying the concept [of negligence] governs" FELA actions. Urie v. Thompson, 337 U.S. 163, 174 (1949). Section 6 of FELA creates a three-year statute of limitations for all actions under section 1 of the statute, counted from the day the cause of action accrued. 45 U.S.C. § 56.

---

[6] In this case, the jury found CSXT 60% negligent under FELA. However, since the jury also found CSXT had violated the LIA, a "statute enacted for the safety of its employees," CSXT was required to pay 100% of Granfield's damages.

Granfield also sued under LIA, formerly known as the Boiler Inspection Act.[7]  By its own terms, the LIA does not purport to confer any right of action upon injured employees.  Urie, 337 U.S. at 188 (1949).  Its role, rather, is to supplement the FELA by imposing on interstate railroad carriers an absolute and continuing duty to provide safe equipment.  Id. (citing Lilly v. Grand Trunk W. R. Co., 317 U.S. 481, 485 (1943)).  The Urie court concluded that the legislative intent behind section 1 of FELA was to treat a violation of the safety standards under the LIA as  negligence -- what is sometimes called negligence per se.  Urie, 337 U.S. at 188-89.

Therefore, the LIA, when read in conjunction with section 3 of FELA, fastens strict liability on railroad carriers who violate its safety standards.  In this case, the jury determined that CSXT had violated the LIA, which liberated Granfield from the burden of having to prove negligence.  He did, however, have to prove that the condition of the throttles and alerters were causally related to his injuries.  As we discuss below, these points were highly contested by CSXT.

On August 17, 2006, the case was transferred to the District of Massachusetts, Western Division.  CSXT then filed a Motion for Summary Judgment dated May 2, 2008, where it argued,

---

[7]  The BIA, 45 U.S.C. § 23, was recodified in 1994 as the Federal Locomotive Inspection Act.  See Pub. L. No. 103-272, § 1(a).

inter alia, that Granfield's claim of bilateral epicondylitis was time-barred under the FELA three-year statute of limitations. See 45 U.S.C. § 56. After hearing oral arguments on the motion, the district judge denied CSXT's motion and scheduled the case for trial.

On October 20, 2008, trial commenced and ten days later, on October 30, the jury rendered its verdict in favor of Granfield. In the Special Verdict form issued to the jury, the Court asked it to find whether or not CSXT was negligent under FELA, and whether or not CSXT violated the LIA. The jury answered "yes" to both questions and awarded $250,000 to Granfield.

On October 29, before the jury had returned its verdict, CSXT had filed a Supplemental Renewed Motion for Judgment as a Matter of Law, where it basically reargued its statute of limitations defense. The motion was denied by the district court on October 31. In its short Endorsed Order denying the motion, the Court noted that CSXT failed to present its arguments on the statute of limitations defense to the jury, and never offered them as part of a proposed special verdict either.

CSXT again filed a Post-Trial Renewed Motion for Judgment as a Matter of Law, along with a supporting Memorandum of Law on November 17, 2008. In these documents, CSXT rehashed its statute of limitations arguments from its previous motions and added others, based on the arguments adopted by Granfield's counsel

-10-

during closing statements.  The district court again denied CSXT's Motion on February 2, 2009.  On March 3, 2009, CSXT entered a Notice of Appeal.  CSXT now maintains that the district court erred in rejecting its statute of limitations arguments.  Specifically, CSXT appeals from the denial of its May 2, 2008 Motion for Summary Judgment and its November 17, 2008 Post-Trial Renewed Motion for Judgment as a Matter of Law.[8]

## II. Discussion

### A.  Statute of Limitations

#### i. Applicable Law

For cases where an employee has been injured over a period of time as the result of continued exposure to unsafe conditions, rather than as a result of a single traumatic event, the Supreme Court adopted the discovery rule, thereby recognizing that a cause of action accrues "only when the accumulated effects of the deleterious substances manifest themselves." Urie, 337 U.S. at 170 (citation omitted).  Later, in United States v. Kubrick, the Court rejected "the notion that tort claims in general or malpractice claims in particular do not accrue until a plaintiff learns his injury was negligently inflicted," although it left open the question of whether a plaintiff needs to know the injury's

---

[8]  We only review the motion for judgment as a matter of law since "defendant's motion for summary judgment has been overtaken by subsequent events, namely, a full-dress trial and an adverse jury verdict."  See Rivera-Torres v. Ortiz Vélez, 341 F.3d 86, 92 (1st Cir. 2003).

-11-

cause for the purpose of determining accrual. 444 U.S. 111, 119-20 (1979) (emphasis added).

FELA states that "[n]o action shall be maintained under this chapter unless commenced within three years from the day the cause of action accrued." 45 U.S.C.A. § 56. We have previously interpreted this part of FELA to mean that "plaintiff has the duty of alleging that he has brought his action in due time." Brassard v. Boston & Maine R.R., 240 F.2d 138, 141 (1st Cir. 1957) (citing Am. R. Co. of Porto Rico v. Coronas, 230 F. 545, 547 (1st Cir. 1916) (commenting in dicta that "it was incumbent upon the plaintiff to allege and prove that his [FELA] cause of action was brought within the time limited"), overruled on other grounds by Reading Co. v. Koons, 271 U.S. 58, 60-64 (1926) (additional citation omitted). Cf. Emmons v. S. Pac. Transp. Co., 701 F.2d 1112, 1118 (5th Cir. 1983) (holding that burden is on claimant to allege and prove that his cause of action was commenced within the three-year statute of limitations period); Carpenter v. Erie R. Co., 132 F.2d 362, 362 (3d Cir. 1942) (dismissing FELA complaint where it "appear[ed] from the face of the complaint that the plaintiff's cause of action arose more than fourteen years before the suit was commenced," because it is "incumbent upon one suing under the act to allege and prove that his cause of action was brought within the time limited") (citation omitted); but see Campbell v. Grand Trunk W. R.R. Co., 238 F.3d 772, 775 (6th Cir.

-12-

2001)(finding that in a FELA case the statute of limitations is an affirmative defense).  Several courts of appeals, as well as our own, have interpreted both Urie and Kubrick to mean that the three-year statute of limitations period begins to run when a plaintiff knows, or should know, of her injury and its cause.  Albert v. Maine Cent. Ry. Co., 905 F.2d 541, 543-44 (1st Cir. 1990); see e.g., Townley v. Norfolk & W. Ry. Co., 887 F.2d 498, 501 (4th Cir. 1989); Kichline v. Consol. Rail Corp., 800 F.2d 356, 360-61 (3d Cir. 1986); DuBose v. Kansas City So. Ry. Co., 729 F.2d 1026, 1030-31 (5th Cir. 1984).  In Albert, we also held that once a plaintiff reaches the conclusion that she has an injury, and that such injury was caused by her employment, she has a duty to investigate the situation in order to confirm or deny her belief.  Albert, 905 F.2d at 544.

### ii. Scope of Review

We review de novo the district court's denial of CSXT's motion for judgment as a matter of law, examining "the evidence presented to the jury, and all reasonable inferences that may be drawn from such evidence, in the light most favorable to the jury verdict." Cigna Ins. Co. v. Oy Saunatec, Ltd., 241 F.3d 1, 8 (1st Cir. 2001) (citation omitted).  We will reverse denial of said motion "only if reasonable persons could not have reached the conclusion that the jury embraced." Sánchez v. Puerto Rico Oil Co., 37 F.3d 712, 716 (1st Cir. 1994).

-13-

### iii. Analysis

CSXT contends that Granfield had the burden of proving his suit was filed in compliance with the FELA statute of limitations and that Granfield failed to do so, requiring judgment as a matter of law for CSXT. In its briefs, CSXT essentially rehashes the arguments it made in its motions for summary judgment and judgment as a matter of law. Both motions were denied by the district court, which found that the question of whether Granfield had complied with the three-year statute of limitations was one for the trier of fact to decide. We agree.

We have reiterated that

> [a]pplication of the discovery rule ordinarily involves questions of fact and therefore in most instances will be decided by the trier of fact. In particular, application of the discovery rule involves determining what the plaintiff knew or should have known, which is a factual question that is appropriate for the trier of fact. Determining when a plaintiff had notice of the likely cause of her injury is one example of such a determination.

Genereux v. Am. Beryllia Corp., 577 F.3d 350, 360 (1st Cir. 2009) (internal citations and quotation marks omitted). In this case, CSXT failed to argue to the jury, the trier of fact, that Granfield did not meet the FELA statute of limitations. Indeed, CSXT failed to make this an issue at trial at all, and failed to request a question on the statute of limitations in the special verdict form. At oral argument, CSXT's counsel explained this was a strategic decision. CSXT now points to circumstantial evidence presented at

-14-

trial which it argues should have led the district court to conclude as a matter of law that Granfield knew or should have known of his injury and its cause more than three years before filing his complaint.

However, as the district court explained when it rejected CSXT's statute of limitations arguments on the papers, the question of when plaintiff's claim arose was a factual one, and plaintiff put forth sufficient evidence to support its theory that the claim arose within the limitations period. On review, we view the evidence in the light most favorable to the nonmovant, Granfield.

In his notes from Granfield's visit to him on July 8, 2003, Dr. Spector noted that Granfield had complained to him of feeling "symptoms" in his left elbow since December 2002. However, the record is unclear as to what these symptoms were, and whether they rose to the magnitude to lead Granfield to consider himself "injured." Generally, de minimis aches and pains are not considered to be an injury for the purposes of the FELA statute of limitations. Green v. CSX Transp., Inc., 414 F.3d 758 (7th Cir. 2005); see also Lancaster v. Norfolk & W. Ry. Co., 773 F.2d 807, 821 (7th Cir. 1985) (rejected on other grounds by Teague v. Nat'l R.R. Passenger Corp., 708 F. Supp. 1344 (D. Mass. 1989)).

At trial, Granfield specifically testified that he was feeling pain in his left elbow; aching, soreness, and swelling in his arm; and tingling in his little finger "around February or

March 2003." A few months later, in late May 2003, Granfield went to see his cardiologist, Dr. Chakraborty, who, after examining Granfield, was unable to diagnose him and thus referred him to Dr. Spector. Although at this point there may have been enough evidence presented to the jury to support a finding that Granfield knew he was injured as of May 2003, the same cannot be said for Granfield's knowledge of the <u>cause</u> of his injury.

During the visit to Dr. Chakraborty, there apparently was no discussion of Granfield's work. The first time we know for certain that Granfield became aware of the possible connection between his work and his injury was during his visit to Dr. Spector on July 2003, when Dr. Spector informed him of the connection. Granfield filed his complaint on June 19, 2006. In order to find for CSXT, the jury would have to find that Granfield knew or should have known, before seeing Dr. Spector, that he was injured and that his employment was the cause of his injuries.

We cannot say, as CSXT requests, that as a matter of law Granfield should have been able to diagnose himself with epicondylities, or have known that his condition was caused by his work as a locomotive engineer. Given all of the evidence presented by Granfield on this issue, we find that a reasonable jury could have concluded that Granfield's claim was not time barred, had CSXT chosen to contest this showing by asking for jury instruction and arguing the matter to the jury.

### B. Dr. Spector's Testimony

At trial, Dr. Spector was Granfield's sole medical causation witness. CSXT first challenged Dr. Spector's testimony in its May 2, 2008 Motion for Summary Judgment. In its motion, CSXT argued that Dr. Spector's opinions were inadmissible under the Federal Rule of Evidence 702 and the seminal case of Daubert v. Merrell Dow Pharmacy, Inc., 509 U.S. 579 (1993), and its progeny. The inadmissibility of Dr. Spector's opinions, CSXT argued, would leave Granfield without any proof as to the element of causation. This in turn would warrant summary judgment in favor of CSXT.

On June 25, 2008, the district judge heard oral arguments on the matter, and afterwards entered an oral order denying the Motion for Summary Judgment. The district judge determined that

> [a]s far as causation goes, I think Doctor Spector's enough to get over the hurdle. He might not clear it by two feet, but he's over it, and we'll have an interesting conflict between the experts on the question of whether the failure to use reasonable care is casually related to the tennis elbow.

Prior to trial, on August 18, 2008, CSXT filed a Motion in Limine to Exclude Plaintiff's Expert, Dr. Carl Spector, from Testifying. CSXT reargued its position that Dr. Spector's opinions were not based on sufficient facts or data, or on reliable scientific methodology. At the Pretrial Conference Hearing on October 8, 2008, the district court denied CSXT's Motion in Limine without prejudice.

-17-

### i. Scope of Review

At the time of trial, Dr. Spector had been licensed to practice orthopedic medicine and surgery in the Commonwealth of Massachusetts for approximately thirty-five years. He was also a board certified orthopedic surgeon. Dr. Spector estimated that every year he treated over a hundred patients with lateral epicondylitis.

During his testimony at trial, Dr. Spector stated that the first time he saw Granfield was on July 8, 2003, when he was referred to his office by Dr. Chakraborty. Dr. Spector also testified that at this meeting he had a long discussion with Granfield about the symptoms he was having, as well as Granfield's work as a locomotive engineer. The following exchange took place when Granfield's attorney conducted the direct examination of Dr. Spector:

Q. Did you gain an understanding of basically what [Granfield] did for work?

A. Yes.

Q. And what was the understanding that you gained?

A. Well, the thing is he has a problem with his elbow. The thing is he has lateral epicondylitis. So I then -- most people when they have lateral epicondylitis, they don't know what they have, one. Two, they don't know what causes it. So the main thing is to explain what they have and what causes it.

So once I went over what it is, then you drive as an engineer and you're using levers so I explained to him what is causing it. So it's important for me

to know what he does. So he has these levers that he uses and we discussed it.

Q. And the fact that he --

A. Why you explain it to the patient is so they can avoid doing what aggravates it or do something to compensate for it.

Dr. Spector referred to the instruments Granfield was required to operate as "levers." When asked to demonstrate the motion that caused Granfield's epicondylitis, Dr. Spector demonstrated a "back and forth" movement of a "lever," which he maintained caused Granfield to use the dorsal muscles of his forearm.

Later on, Granfield's counsel asked Dr. Spector to assume that the throttles and alerter buttons were defective, and that the throttle was a lever, while the alerter was a button. The following question was then asked, over CSXT's objection:

Q. ... Doctor, assuming those facts do you have an opinion within a reasonable degree of medical certainty whether or not Mr. Granfield's lateral epicondylitis in his right elbow was caused by these repetitive movements associated with manipulating these defective controls?

...

A. I can state with a degree of medical certainty that what you said is true. That having to increase these motions because of the defective working of these levers caused him to have this condition.

Q. Why do you believe that?

A. It's well known that this type of repetitive injury causes this condition, lateral epicondylitis, and

-19-

by having to do these extra repetitive motions would have caused this injury.

During his cross-examination, Dr. Spector admitted that he could not quantify the amount of force nor the number of repetitions that Granfield had to carry out in order to manipulate the throttles and alerters.

After Dr. Spector's direct examination concluded, CSXT moved to have his testimony stricken. CSXT reiterated the lack of a Daubert hearing, and argued that Dr. Spector failed to testify on the standards of repetition, force, and posture accepted in the medical community. The district court denied the Motion.

CSXT again maintained that Dr. Spector's opinions were inadmissible in its November 17, 2008 Post-Trial Renewed Motion for Judgment as a Matter of Law. In addition, in its Motion for New Trial filed on the same day, CSXT also claimed that the jury should have been instructed by the district court that expert testimony was necessary to prove causation. The district court denied both motions.

CSXT now appeals from the district court's denial of its Motion in Limine to Exclude Plaintiff's Expert, dated August 18, 2008; its Post-Trial Renewed Motion for Judgment as a Matter of Law; and its Motion for New Trial, both dated November 17, 2008.

CSXT argues that Plaintiff's causation expert, Dr. Spector, should have been precluded from qualifying as an expert on the cause of Plaintiff's injuries because Dr. Spector's testimony

was not based upon sufficient facts or data, and also that it was not based on reliable scientific methodology.  In the alternative, CSXT contends that Dr. Spector's opinion at trial did not provide sufficient evidence for a rational jury to find for Plaintiff on the issue of causation.  We disagree.

As to CSXT's first contention, we review a district court's ruling admitting or excluding expert testimony under the Federal Rules of Evidence for abuse of discretion, Forrestal v. Magendantz, 848 F.2d 303, 305 (1st Cir. 1988), giving broad deference to the determination made by the district court as to the reliability and relevance of expert testimony.  Beaudette v. Louisville Ladder, Inc., 462 F.3d 22, 25 (1st Cir. 2006) (citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 143 (1997)); see also United States v. 33.92356 Acres Of Land, 585 F.3d 1, 7 (1st Cir. 2009).[9]  CSXT's second argument requires us to review the denial of the motion for judgment as a matter of law, which we do de novo. Butynski v. Springfield Terminal R. Co., 592 F.3d 272, 276 (1st Cir. 2010).

In Daubert, the Court outlined a flexible, non-exclusive set of criteria for admitting expert testimony.  509 U.S. 593-95.

---

[9]  In its brief in chief, CSXT argued that the proper standard of review was  clear error  since CSXT had filed a motion in limine to exclude Dr. Spector's testimony and the district court denied it without prejudice.  We continue to assert that the proper standard of review of a denial of admission of expert testimony is abuse of discretion.

The Court considered (1) whether a theory or technique  can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; (4) and general acceptance in the relevant scientific community.  Id. at 593-95.  "The inquiry envisioned by Rule 702 is, [the Court] emphasize[d], a flexible one." Id. at 594.

Since Daubert, courts have expanded that criteria to include, for example, whether the testimony was prepared for the purpose of the litigation or whether it was something that the expert did in her ordinary practice. See Johnson v. Manitowoc Boom Trucks, Inc., 406 F. Supp. 2d 852, 865 (M.D. Tenn. 2005) (noting that an important factor is whether the expert is testifying about matters arising naturally and independently of litigation or whether opinions are developed solely for the purpose of testifying); Allison v. McGhan Med. Corp., 184 F.3d 1300, 1319-21 (11th Cir. 1999) (affirming trial court's decision to exclude expert testimony based, in part, on the fact that the expert created his testimony solely in preparation for trial).

Applying the law to these facts, we first find that CSXT has failed to clear these hurdles, and that the district court did not abuse its discretion in admitting Dr. Spector's testimony.  Dr. Spector is an orthopedic surgeon who specializes in repetitive stress injuries.  Dr. Spector regularly diagnoses repetitive stress injuries,  and treats 100 to 150 patients per year for lateral

-22-

epicondylitis.  At the time of the trial, Dr. Spector had seen more than 2,000 cases of epicondylitis.

We agree with the district court that CSXT is "making something which is relatively simple more complicated."  Dr. Spector testified that repetition causes epicodylitis, and that more repetition makes it more likely that a patient will develop lateral epicondylitis.  The district court explained:

> We have testimony that because of the defect there was more repetition. Now the jury may not accept the doctor's testimony on that. They may believe somebody that says that this type of repetition can never cause epicondylitis whether it's a little bit or a lot, but the essence of the doctor's testimony, the jury may find, is that he says this type of movement will cause epicondylitis and the risk of epicondylitis increases the more that you have to make that kind of movement.

CSXT makes much of the fact that Dr. Spector did not rely on peer-reviewed studies in his causation diagnosis.  The mere fact of publication, or lack thereof, in a peer-reviewed journal is not a determinative factor in assessing the scientific validity of a technique or methodology on which an opinion is premised.  Daubert, 509 U.S. at 593 ("Publication (which is but one element of peer review) is not a sine qua non of admissibility . . . .").

CSXT also takes issue with Dr. Spector's method of analysis, differential diagnosis (a determination of which of two or more diseases, presenting with similar symptoms, had caused a patient's ailments).  We have previously agreed that a differential

-23-

diagnosis is a proper scientific technique for medical doctor expert testimony. See Feliciano-Hill v. Principi, 439 F.3d 18, 25 (1st Cir. 2006); see also Bitler v. A.O. Smith Corp., 391 F.3d 1114, 1123 (10th Cir. 2004) (collecting cases holding that qualified doctor's differential diagnosis of patient was sufficiently reliable for Rule 702 and Daubert purposes).

Given the above, and the fact that Dr. Spector's opinion was formed before litigation was contemplated, we find that the district court did not abuse its discretion in admitting Dr. Spector as an expert on the issue of causation.

The remainder of CSXT's objections to Dr. Spector, even while cloaked as objections to his qualifications under Rule 702, are actually objections about the weight of the evidence. Cf. McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1044 (2d Cir. 1995) (holding that "[d]isputes as to the strength of [expert'] credentials, faults in his use of differential etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony."). Here we also find that CSXT has failed to satisfy its burden of proving that Dr. Spector's testimony was insufficient to establish causation.

This argument properly relates to CSXT's appeals from the district court's denial of its motion for judgment as a matter of

law and for a new trial and is thus reviewed, respectively, de novo and for abuse of discretion.

Dr. Spector testified at trial that the "force [used] is not the important part. It's the repetition . . . that causes scar tissue and bilateral epicondylitis and that having to increase these motions because of the defective working of these levers caused [Granfield] to have this condition."

CSXT did not present their own expert to rebut Dr. Spector's testimony, although it has listed one on the witness list. CSXT also did not offer any medical expert testimony on the causation issue. Considering the above, we find that a reasonable jury could have found Dr. Spector presented sufficient evidence to find that CSXT caused Granfield's injuries.

## C. The Roberts Letter

The Brotherhood of Locomotive Engineers ("BLE"), of which Granfield was a member, collected locomotive work reports, or "5001B reports," between 2000 and 2006. Engineers were required by a BLE directive to fill out these reports periodically, annotating any defects they encountered while operating the locomotives. William Munger, then local chairman of BLE, was in charge of collecting the reports. According to the testimony of its General Chairman, Thomas Roberts, the BLE wanted to perform a "comprehensive study" on these reports.

-25-

Roberts conducted a review of the reports gathered by Munger, and subsequently sent a letter to Richard Regan, CSXT's Chief Mechanical Officer, concerning the condition of the locomotives. In this letter, dated January 20, 2004, Roberts stated, inter alia, the following:

> This is in reference to a number of CSX locomotives . . . and their potential danger to the health of CSX Engineers . . . due to their degenerated condition.
>
> [B]ill Munger, has made a comprehensive study of the dangerous disrepair of these locomotives . . . . [H]is color photo study of the neglected locomotives is attached . . . . [H]is efforts have yet to result in a safe workplace CSX Northern District Engineers in Framingham.
>
> Thus and therefore, I request immediate relief from your office to fix or replace these dangerous locomotives before serious injury strikes, and irreparable damage is done.

During Roberts' cross-examination at trial, CSXT questioned him as to the comprehensiveness of Munger's study. When Roberts answered that he did not know, CSXT's counsel approached him and used the above letter to refresh his memory.[10]

Afterwards, during the redirect examination of Roberts, Granfield's counsel sought to introduce the letter into evidence. The district court admitted the letter into evidence, over CSXT's

---

[10] Roberts had previously been precluded from testifying on the state of the locomotives.

objection, reasoning that as CSXT used the letter to refresh a witness' memory, Granfield had the right to offer it into evidence.

During the marshaling of evidence, at the time when the jury was about to commence its deliberations, the district court overruled its original admission of the letter. The court struck the whole letter and determined that it should not be provided to the jury for its deliberations. The contents of the letter were not read to the jury, nor were they admitted into evidence.

In its November 17, 2008 Motion for New Trial and supporting Memorandum of Law, CSXT argued, inter alia, that it was unfairly prejudiced by the Court's initial admission of the letter. CSXT now appeals from the denial of this motion by the district court on February 2, 2009.

### i. Standard/Scope of Review

We review a denial of a Motion for a New Trial under an abuse of discretion standard. Simon v. Navon, 71 F.3d 9, 13 (1st Cir. 1995). We have sent cases back for a new trial when we have found the trial court abused its discretion in not granting a new trial where it had admitted irrelevant and highly prejudicial damages evidence which tainted the award. Soto Lebrón v. Fed. Express Corp., 538 F.3d 45 (1st Cir. 2008).

This court's standard for determining whether the admission of such evidence resulted in harmless error is "whether we can say 'with fair assurance . . . that the judgment was not

-27-

substantially swayed by the error . . . .'" <u>Stacey Marie Vincent</u> v. <u>Louis Marx & Co.</u>, 874 F.2d 36, 41 (1st Cir. 1989). "The centrality of the evidence, its prejudicial effect, whether it is cumulative, the use of the evidence by counsel, and the closeness of the case are all factors which bear on this determination." <u>Id.</u>

### ii. Analysis

Typically, when a party uses a writing to refresh a witness's memory, the opposing party has the right to offer "those portions [of the writing] which relate to the testimony of the witness" into evidence. Fed. R. Evidence 612. Rule 612 also states that "[i]f it is claimed that the writing contains matters not related to the subject matter of the testimony the court shall examine the writing in camera, excise any portions not so related, and order delivery of the remainder to the party entitled thereto." <u>Id.</u> Rule 612 has never been construed to require that a writing used to refresh a witness' recollection must be independently admissible into evidence. <u>United States</u> v. <u>Shinderman</u>, 515 F.3d 5, 18 (1st Cir. 2008).

Here, the letter impeached by CSXT contained general and possibly prejudicial language on the state of the locomotives, mainly that they were in "degenerated condition," "dangerous disrepair," and presented an unsafe workplace for CSXT engineers. During cross-examination, CSXT's counsel used the letter to refresh Robert's recollection as to the "comprehensiveness" of the study

-28-

carried out by Munger. At re-direct, Granfield's counsel introduced the letter into evidence, over CSXT's objection, and asked Roberts what the letter said. The district court refused to allow Roberts to read the letter aloud, reasoning that the jury would be able to read it on their own later. Granfield's counsel then asked Roberts four questions relating to the letter. In response to these questions, Roberts testified that he thought the locomotives provided a risk of serious injury and had slipped into a state of disrepair, due to holes being present on the floor, among other things.

CSXT maintains that the testimony elicited from Roberts through the use of the letter was highly prejudicial and substantially swayed the jury. Furthermore, CSXT contends the letter undermined its efforts to prove it employed reasonable care in the maintenance of its locomotives.

We ultimately find that this testimony, even assuming its admission was error, was harmless. Several reasons guide us in this determination.

First, the letter was never read out loud to the jury, so any prejudice came from Roberts' testimony on the state of the locomotives. This testimony, including the phrases "state of disrepair" and "risk of serious injury," was brief and was cumulative with the other evidence presented relating to the state of the locomotives.

Second, during the re-cross CSXT's counsel was able to confront Roberts on the contents of the letter. During this confrontation, Roberts admitted that the Munger study referenced in the letter only concerned the floors of the locomotives, which were apparently plagued by holes. Roberts further admitted that nothing in the letter had any relevancy to the state of the throttles and alerters, the main issue at trial. At this point, any prejudicial effect on the jury was neutralized by CSXT's counsel. CSXT's counsel adequately established that the letter was irrelevant to the condition of the throttles and alerters and was instead only relevant to the condition of the floors of the locomotives.[11]

Finally, the letter never actually reached the jury. Considering the above, we find that the brief statements by Roberts as to the contents of the letter was harmless error.

### D. Closing Arguments

After the conclusion of closing arguments, CSXT counsel objected, arguing that Granfield's counsel had twice attacked him personally and also misstated what the evidence was concerning other engineers who had developed epicondylitis from operating the same locomotives Granfield was required to operate.

In particular, CSXT objected to the following statement made by Granfield's counsel during his closing argument:

---

[11] No evidence was presented at trial and no argument has been offered that the condition on the locomotives' floor was related to Granfield's lateral epicondylitis.

-30-

Mr. Flynn is the one who says nobody else got it. What witness came in and said, "Yeah, there's been no other claims by other engineers saying that they have lateral epicondylitis due to the throttles and alerters." What witness said that? I didn't hear that witness. Maybe I wasn't there that day. I'm pretty sure I was here every day. The only one who said that was Mr. Flynn. And what Mr. Flynn says isn't evidence.

CSXT pointed out that John O'Neill, a trainmaster working for CSXT and one of its witnesses, testified at trial that no engineer, other than Granfield, had ever complained of developing epicondylitis as a result of the condition of the throttles and alerters in the locomotives Granfield was required to operate.[12]

The district judge heard the objection and decided to give a general curative instruction to the jury before its general instructions. The judge stated:

I wanted to remind you that although the attorneys would not deliberately mislead you, it may be, as you review your own notes or the recollection of the testimony, that there's some inconsistencies or an inconsistency or two, or whatever, between what the attorney said in their closings as to what they thought the evidence showed and what your recollection of the evidence was. Please remember to be guided by your own recollection

_____

[12] The following exchange took place during O'Neill's direct examination by CSXT:

Q. Has any engineer, other than Mr. Granfield, ever complained they have developed tennis elbow as a result of the condition of throttles or alerters in the 6200 series locomotives between 2000 and 2006?

A. No.

> of the evidence, your collective recollection,
> as you go through your deliberations and that
> if there are inconsistencies, of course follow
> your own recollections and not follow the
> attorneys' representations.

After the trial ended, CSXT again made the argument that Granfield's counsel's comments were inappropriate and warranted a new trial in its November 17, 2008 Motion for New Trial. This time, however, CSXT enumerated a litany of additional statements made by Granfield's counsel during closing arguments which it considered also to be improper and warranted a new trial. CSXT argued that the statements unfairly prejudiced the jury and that the curative instructions from the district judge were not enough to overcome their prejudicial effect.

Specifically, CSXT alleged that Granfield's counsel made improper remarks as he: (1) asked the jury to walk in Granfield's shoes; (2) misstated facts and evidence presented at trial; (3) interjected his personal opinions and beliefs regarding the credibility of witnesses; and (4) interjected emotional, inflammatory, and prejudicial elements into jury deliberations. CSXT also argued that the district court's curative instruction was insufficient to counter the alleged prejudice caused on the jury by Granfield's counsel's improper remarks.

As stated previously, CSXT's Motion for New Trial was denied on February 2, 2009, and CSXT now appeals from this decision.

-32-

### i.  Standard/Scope of Review

We review the comments timely objected to under an abuse of discretion standard.[13]  "Absent an abuse of discretion, we will defer to the district court's denial of a motion for a new trial on the basis of improper argument or conduct of counsel."  P.R. Aqueduct & Sewer Auth. v. Constructora Lluch, Inc., 169 F.3d 68, 81-82 (1st Cir. 1999); see also Johnson v. Nat'l Sea Prods., Ltd., 35 F.3d 626, 631 (1st Cir. 1994).

In assessing the effect of allegedly improper conduct by counsel, the Court must examine the totality of the circumstances, including (1) the nature of the comments; (2) their frequency; (3) their possible relevance to the real issues before the jury; (4) the manner in which the parties and the court treated the comments; (5) the strength of the case; and (6) the verdict itself.  See Forrestal, 848 F.2d at 309; see also González Marín v. Equitable Life Assurance Soc'y, 845 F.2d 1140, 1147 (1st Cir. 1988).

On the other hand, untimely objections, which a party fails to make immediately after closing arguments, are reviewed for plain error.  Smith v. Kmart Corp., 177 F.3d 19, 25 (1st Cir. 1999).  Thus CSXT must establish that (1) an error was committed; (2) the error was "plain" (i.e. obvious and clear under current law); (3) the error was prejudicial (i.e. affected substantial

---

[13]  Namely, the comment on what the evidence was on other engineers who had developed epicondylitis from operating the alerters and throttles on the 6200 series locomotives.

rights); and (4) review is needed to prevent "a miscarriage of justice or [if the error has] seriously affected the fairness, integrity or public reputation of the judicial proceedings." Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp., 79 F.3d 182, 189 (1st Cir. 1996). See also Chute v. Sears Roebuck & Co., 143 F.3d 629, 631 (1st Cir. 1998); United States v. Bartelho, 129 F.3d 663, 673 (1st Cir. 1997); Cambridge Plating Co., Inc. v. Napco, Inc., 85 F.3d 752, 767 (1st Cir. 1996) ("Plain error is a rare species in civil litigation, encompassing only those errors that reach the pinnacle of fault.") (internal quotations omitted).

## ii. Analysis

We begin first by addressing the comment timely objected to by CSXT. CSXT argues that, during closing argument, Granfield's counsel misstated what the evidence was concerning other engineers who had developed epicondylitis, as a result of operating the GP40 6200 series locomotives. CSXT pointed out that one of its witnesses, O'Neill, had testified that no engineer, other than Granfield, had complained of developing the injury as a result of the condition of the throttles and alerters in the 6200 series locomotives. After CSXT objected to Granfield's counsel's remarks, Granfield's counsel countered that O'Neill did not possess the requisite knowledge and information from which to testify on the amount of engineers, if any, who had complained of developing lateral epicondylitis.

The jury heard O'Neil's testimony and even if counsel's remarks had a tendency to mislead, we believe the brief comments were sufficiently neutralized by the district judge's curative instructions. See Hatfield-Bermúdez v. Aldanondo-Rivera, 496 F.3d 51, 64 (1st Cir. 2007).

As to the unobjected-to alleged errors, CSXT contends that Granfield's counsel made an improper statement when he asked the jury to walk in Granfield's shoes "for just a couple of hours while you're thinking about his case." There can be little doubt that suggesting to the jury that it put itself in the shoes of a plaintiff is improper. Forrestal, 848 F.2d at 309. The walking in plaintiff's shoes argument, or as it is sometimes called, the Golden Rule argument, has been "universally condemned because it encourages the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on evidence." Id. (internal quotations omitted); see also Ivy v. Sec. Barge Lines, Inc., 585 F.2d 732 (5th Cir. 1978) rev'd en banc on other grounds, 606 F.2d 524 (5th Cir. 1979) (en banc), cert. denied, 446 U.S. 956 (1980). Nonetheless, we have never held that the use of such language is per se reversible error. To the contrary, we have held that we will engage in a totality of the circumstances analysis which "[f]irst and foremost [recognizes] the deference due the district court's judgment." Forrestal, 848 F.2d at 309.

Nevertheless, we believe that these sorts of remarks by were adequately dealt with by the district judge's instructions, and conclude that no plain error occurred. See Forrestal, 848 F.2d at 310; see also Blevins v. Cessna Aircraft Co., 728 F.2d 1576 (10th Cir. 1984).

Second, CSXT objects to several statements made by Granfield's counsel during closing argument, arguing that such statements misstated the facts and evidence presented at trial. Two examples of these statements are: (1) "the plaintiff had no ability to take a locomotive out of service;" and (2) "Mr. Granfield, this is his only opportunity to get compensation in this case for his injuries."

As to the first statement, federal regulations require that a locomotive engineer take the locomotive out of service if it is unsafe. The second statement, according to CSXT, ignored the fact that Granfield was then receiving $38,000 a year in Railroad Retirement Board Benefits. Again, we believe that individually and cumulatively, the statements cited failed to raise to the level of plain error.

The same can be said for the other statements CSXT is objecting to: the statements attacking the credibility of CSXT's witnesses and the remarks allegedly interjecting "emotional, inflammatory and prejudicial elements" into jury deliberations. The district judge properly dealt with these by instructing the

jury to only consider the evidence, and not be swayed by emotions

or sympathy.  Thus, no plain error was committed.[14]

For the reasons stated above, we affirm the judgment.

**Affirmed**.

---

[14]  CSXT also requests that we enter judgment in its favor, or in the alternative order a new trial, based on the cumulative error doctrine outlined in United States v. Sepúlveda, 15 F.3d 1161, 1195-96 (1st Cir. 1993).  Given that we have found the district court committed no errors, we decline to do so.